05-146

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 460

KIM J. KAFKA and CINDY R. KAFKA, Individually and as Husband and Wife; and as members of DIAMOND K RANCH ENTERPRISES LLC, a Montana Limited Liability Company,

        Plaintiffs and Appellants,

  and

JACK BRIDGEWATER and MYRA BRIDGEWATER, Individually and as members of PHANTOM BULL ELK RANCH LLC, and JIM BOUMA and BARBARA BOUMA,

        Plaintiff-Intervenors and Appellants,

  v.

THE MONTANA DEPARTMENT OF FISH, WILDLIFE AND PARKS, and THE STATE OF MONTANA,

        Defendants and Appellees,

  and

SPORTSMEN FOR I-143, MONTANA WILDLIFE FEDERATION,

        Defendant-Intervenors and Appellees.

APPEAL FROM:    District Court of the Twelfth Judicial District,
                In and For the County of Hill, Cause No. DV 2002-059
                Honorable David G. Rice, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          John E. Bloomquist (argued), Abigail J. St. Lawrence, Doney Crowley Bloomquist Payne Uda P.C., Helena, Montana

      For Plaintiff-Intervenors and Appellants:

          Ward E. Taleff, Taleff Law Office, P.C., Great Falls, Montana

For Appellee:

Hon. Mike McGrath, Montana Attorny General, Chris D. Tweeten (argued), Assistant Attorney General, Helena, Montana

Robert N. Lane, Montana Department of Fish, Wildlife and Parks, Helena, Montana

For Defendant-Intervenors and Appellees:

Jack R. Tuholske (argued), Sarah K. McMillan, Tuholske Law Office, P.C., Missoula, Montana

Argued: September 13, 2006
Submitted: June 20, 2007
Decided: December 31, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Appellants Kim and Cindy Kafka, Jack and Myra Bridgewater, and Jim and Barbara Bouma appeal an order of the Twelfth Judicial District Court denying their takings claims against the state of Montana and the Department of Fish, Wildlife and Parks (FWP), an agency of the state of Montana. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Appellants in this case are all owners and operators of alternative livestock game farms (Game Farms) within the state of Montana. To operate a Game Farm, the owner/operator must have a valid alternative Game Farm license (License) issued by FWP. The requirements for the Licenses are found in Title 87, chapter 4, part 4 of the Montana Code Annotated and are fairly demanding due to the threat posed by chronic wasting disease (CWD).[1] The appellants in this case all obtained their Licenses at varying times throughout the 1990's and have complied with the requirements of part 4 since that time.

¶3 Kim and Cindy Kafka (Kafkas) are members of Diamond K Ranch Enterprises, LLC, located in Hill County. In 1996, the Kafkas applied for a License with FWP and entered into a lease for a tract of land on which to operate an alternative livestock breeding operation. After receiving their License, they began operating in March 1997. In 1998, after obtaining a second License, the Kafkas expanded their operations to focus on the fee-shooting of alternative livestock as their primary revenue source. This

---

[1] "CWD is a fatal disease of the central nervous system of captive and free-ranging mule deer, white-tailed deer, and Rocky Mountain elk." *Hagener v. Wallace*, 2002 MT 109, ¶ 25 n. 1, 309 Mont. 473, ¶ 25 n. 1, 47 P.3d 847, ¶ 25 n. 1.

operation was conducted on an 1100-acre parcel of land roughly twenty miles from the site of the original breeding operation. The Kafkas purchased this land through a series of three transactions, beginning in 1993 and ending with the finalization of a deed in 2003. In addition to purchasing land and going through the License application process, the Kafkas invested several hundred thousand dollars in other start-up costs, including fencing and the acquisition of stock. According to the record, these costs totaled roughly $463,000. In 1999, the Kafkas reported $11,000 in income from their Game Farm operations on their federal tax returns, with that figure rising significantly during the year 2000.

¶4     Jim and Barbara Bouma (Boumas) operate a Game Farm in Teton County. The Boumas began their Game Farm operations in May 1997, by operating a breeder facility which would allow them to market large shooter bulls to other Game Farms which allowed fee-shooting. Like the Kafkas, the Boumas hold Licenses issued by FWP. The Boumas' breeder operation spans three parcels of land, two of which they acquired in 1996 at a price of $55,000 and a third totaling 126.777 acres, which was acquired as part of a larger purchase of 258.067 acres in December 1999 for approximately $325,000. In March 2000, the Boumas sought to expand their operations onto the remaining 129 acres of their parcel. Like the Kafkas, the Boumas made other investments necessary to institute their breeder operation, such as acquiring stock, License-related application costs, and fencing. According to the record, the Boumas never sold significant numbers of alternative livestock and their operation never generated a taxable profit.

¶5 Jack and Myra Bridgewater (Bridgewaters) are the owners of the Phantom Bull Elk Ranch, LLC, located in Bridgewater County. The Bridgewaters entered into the Game Farm business in 1992, and focused primarily on fee-shooting as the primary source of income, although they had also harvested and marketed antlers from their alternative livestock for the velvet market. They purchased the property on which their Game Farm operated in 1990 for approximately $415,000. Like the other appellants, the Bridgewaters invested in the infrastructure necessary to operate a Game Farm. Between 1993 and 2000, their Game Farm generated cash flow in excess of $1.1 million dollars, although the Bridgewaters never reported any profit on their tax returns.

¶6 As is common among regulatory schemes, the requirements for maintaining a License under part 4 have changed somewhat throughout the years. However, on November 7, 2000, part 4 underwent a radical change as a result of the passage of Initiative Measure No. 143 (I-143) by the citizens of Montana. I-143 amended two very significant subsections of part 4. First, it resulted in the deletion of the existing language in § 87-4-412(2), MCA (1999),[2] which permitted a License holder to transfer his License, and substituted the following: "An alternative livestock ranch license for a specific facility is not transferable." Section 87-4-412(2), MCA (2001). More significant was I-143's effect on § 87-4-414(2), MCA (1999), as indicated below. The pre-I-143 version of the statute is in normal type face, and the I-143 addition to the statute is in bold.

---

[2] The pertinent language of these statutes reads as follows: "An alternative livestock ranch license for a specific facility is transferable with the consent of the department." Section 87-4-412(2), MCA (1999).

(2) The licensee may acquire, breed, grow, keep, pursue, handle, harvest, use, sell, or dispose of the alternative livestock and their progeny in any quantity and at any time of year as long as the licensee complies with the requirements of this part, **except that the licensee may not allow the shooting of game animals or alternative livestock, as defined in 87-2-101 or 87-4-406, or of any exotic big game species for a fee or other remuneration on an alternative livestock facility.**

Section 87-4-414(2), MCA (2001) (emphasis added).

¶7 Notably, the initiative did not revoke appellants' Licenses, nor did it result in the confiscation of their alternative livestock. Instead, I-143 prohibited Game Farm operators from charging a fee to shoot alternative livestock. This was a significant departure from the previous scheme because some individuals were willing to expend significant amounts of money to shoot alternative livestock within the confines of a Game Farm. By prohibiting fee-shooting, I-143 eliminated the most profitable use of the alternative livestock, and thus the profitability of Game Farms in Montana. At the same time, it did not eliminate all uses of the alternative livestock, as part 4 still permitted Game Farm owners to maintain their herds, harvest the animals for their meat or antlers, or sell them in out-of-state markets where fee-shooting was still legal.

¶8 Aside from these small but extremely significant changes, the remainder of part 4 was unaltered by I-143's passage. All parties concede that the Game Farm industry was, and still is, a highly regulated industry. Both before and after the passage of I-143, part 4 conditioned the ability of the licensee to breed, harvest, sell, or dispose of alternative livestock upon "compli[ance] with the requirement of this part . . . ." Section 87-4-414(2), MCA. Part 4 also states that FWP reserves the right to revoke a License if the owner/operator "fail[s] to operate an alternative livestock ranch according to the

6

provisions of this part, rules adopted under this part, or stipulations of the alternative livestock ranch license . . . ." Section 87-4-427(1)(a), MCA. Part 4 outlines in detail the reporting, testing, and recording duties incumbent upon a Game Farm operator, details the steps the operator must take to receive a License, and gives FWP broad authority to inspect and quarantine alternative livestock if necessary. Part 4 also requires environmental assessments (EA) of any proposed operations. It places conditions upon the use and disposition of alternative livestock, and further provides that alternative livestock are the private property of the License holder "for which the licensee is responsible as provided by law." Section 87-4-414(1), MCA. Moreover, there are numerous implementing regulations governing the Game Farms which control virtually every aspect of the Game Farm industry. *See* Admin R. M. §§ 32.4.101-1320 (2008).

¶9     Because I-143 eliminated the in-state market for fee-shooting and impaired the profitability of their Game Farm operations, the Kafkas challenged the validity of I-143 in District Court. On April 5, 2002, the Kafkas filed suit against the State and FWP, challenging the lawfulness and constitutionality of I-143 on a variety of grounds. On May 8, 2002, appellees-intervenors Sportsmen for I-143 and Montana Wildlife Federation were permitted to intervene, opposing the Kafkas. On October 21, 2002, the District Court dismissed six of the seven counts alleged in the original complaint, none of which are on appeal before this Court. The remaining claim concerned whether the passage and implementation of I-143 resulted in a taking of various property interests held by the Kafkas under Article II, Section 29 of the Montana Constitution and the Fifth Amendment to the U.S. Constitution. The property interests allegedly taken by I-143

7

included the Kafkas' animals, Licenses, real property, improvements, business, goodwill and livelihoods.

¶10   As litigation before the District Court proceeded, the Bridgewaters and Boumas were granted leave to intervene and join the Kafkas in challenging I-143's constitutionality.   On February 25, 2003, the District Court bifurcated the legal proceedings and decided the takings claims would be determined separately.   If the District Court found a taking had occurred, it would then submit the determination of damages to a jury.

¶11   On May 19 and 20, 2004, the District Court held a bench trial on appellants' takings claims under the Montana and U.S. Constitutions.   In the course of this trial, the District Court received voluminous testimony and evidence.   On February 8, 2005, the District Court issued a detailed and comprehensive order containing seventy-three findings of fact and fifty-one conclusions of law and ultimately denied appellants' takings claims.   The District Court held that the enactment and enforcement of I-143 did not amount to a compensable taking of appellants' private property under the Montana or U.S. Constitutions.   Judgment was rendered against appellants and they have timely appealed to this Court.

¶12   Appellants challenge the District Court's order in several respects.   We describe the rationale underlying the order in broad terms to convey a sense of the District Court's reasoning and analysis.   First, we turn to the relevant portions of the District Court's findings of fact.  The District Court found that all parties knew the Game Farm industry was highly regulated, existing only by virtue of legislative permission, and that the

8

legislature reserved the ability to change the regulations governing Game Farms at all times. The District Court pointed to specific portions of the EA prepared for the Kafkas' operations in which FWP warned them of public unrest regarding Game Farms due to the threat posed by CWD and their negative impact on Montana's fair chase hunting tradition. For instance, in the EA prepared in 1996, FWP specifically noted that "[t]here are many people who would like to see game farming prohibited in Montana. Some of these people belong to organizations that will probably continue their efforts to have legislation passed to eliminate game farming." In the EA for the Kafkas' second License, FWP noted much public concern on the negative effect that Game Farms have on Montana's hunting heritage and the sport of hunting in Montana. However, FWP also noted that game farms were legitimate, regulated activities, approved by the legislature, and that it had "no authority to regulate game farms based solely on public sentiment." Although there was no evidence that the Boumas or Bridgewaters received these same warnings, the District Court found that they knew, or should have known, about the tentative status of Game Farms in Montana.

¶13    The District Court also issued findings concerning the economic effect of I-143 with respect to appellants' property interests. On the one hand, the District Court found appellants' real estate retained significant value in spite of I-143 and that some of appellants' lands had appreciated in value since initially purchased. With respect to the Kafkas, the District Court found that the "highest and best use" of the land associated with their original breeder operation was as "a small tract of range land, with a possible conversion to a rural home site with adjoining pasture." Its value for this use as of

November 7, 2000, was $34,720. The second property's "highest and best use" was found to be as "rangeland with recreational influences, used for the production of livestock and a potential homesite," and its value as of November 7, 2000, was $336,000. Although the Kafkas argued that covenants in the title documents prevented such a use, the District Court was not persuaded by their evidence on this point. The District Court also took notice of the fact that the covenants in question had already been lifted by agreement entered into between the Kafkas and Hill County on March 29, 2004. Further, the District Court rejected expert testimony presented by the Kafkas that the "highest and best use" of their lands was as Game Farms, finding that their expert testimony failed to conform to the standards established under the uniform standards for professional appraisal practice.

¶14 With respect to the Bridgewaters' property, the District Court similarly found that its "highest and best use" was as a "recreational ranch," and that the value of the land, improvements, and fixtures was $945,000 as of November 7, 2000. This was an approximately 100% appreciation in the value of the land since initially purchased in 1990. The District Court observed that the Bridgewaters did not provide expert testimony regarding the value of the land and its fixtures, or its highest and best use, and that their expert specifically denied having appraised any of the Bridgewaters' tangible real or personal property.

¶15 The District Court found the "highest and best use" of the Boumas' property to be for "agricultural production with the potential for future development for industrial or rural use." Its valuation for these uses as of November 7, 2000, was $258,000. This

10

represented the value of the two original lots, now worth $87,000, and the third lot worth $171,000. These figures also represented a notable appreciation in the value of the Boumas' lands. Further, the District Court observed that the Boumas, like the Bridgewaters, provided no testimony as to the value of the land, its fixtures, its highest and best use, nor did they provide an expert appraisal of their tangible real or personal property.

¶16 The District Court did, however, find that appellants' alternative livestock suffered a substantial loss in value as a result of I-143. As the District Court noted, before I-143, the Kafkas could fetch $5,000 to $6,000 per head of alternative livestock by virtue of fee-shooting. After I-143, each head of livestock was worth only between $1,700 and $1,800 in out-of-state markets. Although there was testimony of even greater devaluations of the livestock of the Boumas and Bridgewaters, the District Court did not refer to these in its order. *See* ¶ 84.

¶17 The District Court then issued findings suggesting that this particular economic impact could be mitigated. The District Court noted that there still remained out-of-state markets for alternative livestock, and that appellants could harvest the alternative livestock for their meat and antlers. For instance, the Bridgewaters had been able to sell a herd of 160 of their alternative livestock to an out-of-state concern for approximately $80,000. The District Court also noted that none of the appellants had indicated any taxable profit on their tax returns, thus implying that their businesses were not profitable to begin with.

11

¶18    Ultimately, the District Court's findings suggest that the Kafkas suffered the greatest economic impact, the Bridgewaters somewhat less, while the Boumas suffered no direct economic impact at all.   The District Court tempered these conclusions by observing that all appellants either knew, or should have known, that Game Farms were highly controversial in Montana and that they were obliged to comply with any changes in the governing laws.   Further, the District Court found that I-143 served a legitimate state interest, insofar as it promoted Montana's hunting heritage, protected wild game populations from the spread of disease and hybridization, and thus generally protected the sport of hunting in Montana.

¶19    In its conclusions of law, the District Court examined each of appellants' property interests separately to determine if they had been taken by I-143.   The District Court began by considering whether appellants' Licenses and intangible business assets (i.e., good will and going-concern value) were compensable property interests[3] under the Fifth Amendment and Article II, Section 29.   After reviewing the pertinent authorities, the District Court concluded that the Licenses were not compensable property interests and therefore could not be "taken."   With respect to appellants' intangible business assets, the District Court concluded they were not taken because such interests are not compensable in the regulatory taking context.

---

[3]    Throughout this Opinion, the phrase "compensable property interest" refers solely to a property interest which is potentially compensable under the Fifth Amendment or Article II, Section 29.   This phrase does not refer to property interests that may be entitled to due process protections under the U.S. or Montana Constitutions.   *See* ¶ 40.

¶20 The District Court acknowledged that the land, alternative livestock, and other physical assets were compensable property interests, but ultimately found that none of these compensable property interests were taken by I-143. The District Court rejected the argument that appellants had suffered a "categorical taking" under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992), because these items continued to retain economic value, even if greatly diminished; thus, the conditions necessary for applying the *Lucas* analysis were not satisfied.

¶21 The District Court then went on to consider whether there was a taking under the factors-based analysis from *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978).[4] On the one hand, the District Court failed to see any evidence of an economic impact on appellants' land and fixtures as a result of I-143. In this regard, the District Court noted that appellants failed to provide any expert appraisals to demonstrate the impact of I-143 on their real estate interests. However, the District Court did recognize a significant impact on appellants' alternative livestock. Overall, however, the District Court concluded that any reasonable investment-backed expectations appellants may have had regarding their Game Farms had to be tempered against the reality that they were operating in a highly regulated, controversial field, where the State was free to change the regulatory environment. In short, appellants should have reasonably anticipated that something like I-143 was on the horizon. Additionally, the District Court found that the character of the governmental action embodied in I-143 was a valid exercise of the police power of the State and substantially advanced a number of

_____

[4] The *Penn Central* analysis is described in greater detail below at ¶¶ 67-72.

legitimate state interests. Accordingly, the State had no constitutional duty to compensate appellants for the effects of I-143, no matter how greatly it impaired the profitability of appellants' businesses.

¶22 Appellants argue on appeal that several of the District Court's findings were clearly erroneous. The Kafkas, for instance, argue that the District Court improperly relied on tax return information to conclude that their businesses suffered no significant economic impact as a result of I-143. Additionally, they argue that the evidence before the District Court showed that there was no viable out-of-state market for their alternative livestock or their by-products, and that after I-143 they could only sell these animals at a loss. They also argue the District Court improperly relied upon on the various "highest and best use" appraisals for their parcels of land provided by the State's experts. They further dispute the finding that they should have known that the Montana voters might approve and pass a measure like I-143. The Boumas and Bridgewaters join in these arguments, adding further criticisms of the appraisal methods upon with the District Court based its findings.

¶23 In addition to challenging some of the District Court's factual findings, appellants fault the District Court for concluding that their Licenses and intangible business assets were not compensable property interests. Appellants maintain that the District Court should have concluded these interests were compensable and then analyzed them under the appropriate takings analysis. Additionally, appellants argue that the District Court erred in its takings analysis of its interests in the land and alternative livestock with respect to each of the *Penn Central* factors. They argue that the District Court failed to

appreciate the economic impact I-143 had on their businesses and property, relying too much on the fact that appellants failed to report a taxable profit on their tax returns. They also assert that their investment-backed expectations were reasonable, in spite of the fact that they were participating in a highly regulated field of business. Further, they fault the District Court for placing too much emphasis on whether I-143 was a legitimate exercise of the State's police power, and overlooking the fact that I-143 unfairly forces appellants to bear the economic burden associated with the elimination of Game Farms in Montana.

¶24 Appellants urge us to conclude that the District Court erred, and that I-143 effected an unconstitutional taking of their Licenses and tangible and intangible business assets. The State and intervenors maintain the District Court's order was correct in its particulars and urge us to affirm.

## ISSUES

¶25 We restate the issues on appeal as follows:

¶26 **Issue One:** *Did the District Court err in concluding that the enactment and enforcement of I-143 did not amount to a taking of appellants' Licenses and the goodwill and going-concern value of their businesses under the Fifth Amendment and Article II, Section 29 of the Montana Constitution?*

¶27 **Issue Two:** *Did the District Court err in concluding that the enactment and enforcement of I-143 did not amount to a taking of appellants' real and tangible personal property under the Fifth Amendment and Article II, Section 29 of the Montana Constitution?*

## STANDARD OF REVIEW

15

¶28 We review a district court's conclusions of law to determine whether they are correct. *State v. Fyant*, 2004 MT 298, ¶ 7, 323 Mont. 408, ¶ 7, 104 P.3d 434, ¶ 7. We review findings of fact under the clearly erroneous standard pursuant to M. R. Civ. P. 52(a). We use a three-part test to determine if a finding is clearly erroneous. *Interstate Prod. Credit Assn. v. DeSaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991). First, we examine the record to determine if the findings are supported by substantial evidence. *DeSaye*, 250 Mont. at 323, 820 P.2d at 1287. Second, we consider whether the trial court has misapprehended the effect of the evidence. *DeSaye*, 250 Mont. at 323, 820 P.2d at 1287. Third, if both of these tests are satisfied, we may still conclude that "[a] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." *DeSaye*, 250 Mont. at 323, 820 P.2d at 1287 (quotation omitted).

**DISCUSSION**

¶29 **Issue One:** *Did the District Court err in concluding that the enactment and enforcement of I-143 did not amount to a taking of appellants' Licenses and the goodwill and going-concern value of their businesses under the Fifth Amendment and Article II, Section 29 of the Montana Constitution?*

¶30 The Takings Clause of the United States Constitution provides in pertinent part that private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. Article II, Section 29 of the Montana Constitution states that "[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner." Although the plain language of these provisions differ insofar as Section 29 refers to both

16

"taking" and "damaging" as a basis for just compensation, we have generally looked to federal case law for guidance when considering a takings claim brought under Article II, Section 29. *Western Energy Co. v. Genie Land Co.*, 227 Mont. 74, 77-78, 737 P.2d 478, 480-83 (1987); *Germann v. Stephens*, 2006 MT 130, ¶¶ 27-28, 332 Mont. 303, ¶¶ 27-28, 137 P.3d 545, ¶¶ 27-28. This approach is consistent with that of other jurisdictions which have similar or identical language in their state constitutions.[5] *E.g., San Remo Hotel L.P. v. City and Co. of San Francisco*, 41 P.3d 87, 100-101 (Cal. 2002) (citations and quotations omitted, alterations in original) ("By virtue of including 'damage[]' to property as well as its 'tak[ing],' the California clause protects a somewhat broader range of property values than does the corresponding federal provision. But aside from that difference . . . we appear to have construed the clauses congruently.").

¶31 In its order, the District Court concluded that appellants had waived any argument they may have had that Article II, Section 29 provides greater protection in the regulatory taking context than the Fifth Amendment. In conclusion of law No. 3, the District Court held that "Plaintiffs have conceded that analysis under the Montana Constitution does not differ from that under the Fifth Amendment . . . ." In their briefing before this Court, appellants have not mounted a challenge to this conclusion. Moreover, appellants rely almost exclusively on federal case law to challenge the District Court's application of the *Penn Central* factors. Because the parties and the District Court have adhered to our

---

[5] As an aside, we note that the plain language of Article II, Section 29 is not unique among state constitutions. Roughly half the jurisdictions in the United States have the "or damaged" language in their state constitutions. Julius L. Sackman, *Nichols on Eminent Domain* vol. 2A, § 6.01[12][c], 6-29 (3d ed., Matthew Bender 2008).

17

previous approach of looking towards federal jurisprudence when considering takings claims under Montana law, we will continue to follow that approach here.

¶32   "A takings claim requires a two-step analysis in which a court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking.   The question of whether plaintiffs owned a compensable property interest presents a question of law based on factual underpinnings." *Mohlen v. United States*, 74 Fed. Cl. 656, 660 (Fed. Cl. 2006) (quotation omitted).   After a compensable property interest has been established "the court decides if the governmental action at issue constituted a taking of that property." *Mohlen*, 74 Fed. Cl. at 661.   As we have stated in a similar context, "[u]nder Montana law, the threshold question of whether one has a protected property interest must . . . be answered in the affirmative before the question of whether one was deprived of that interest may be submitted to the trier of fact." *Seven Up Pete Venture v. State*, 2005 MT 146, ¶ 26, 327 Mont. 306, ¶ 26, 114 P.3d 1009, ¶ 26 (quotation and alterations omitted, ellipsis in original); *accord Maritrans, Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003).

¶33   Property interests themselves are not defined by the Takings Clause, or for that matter by Article II, Section 29; "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S. Ct. 2862, 2872 (1984) (quotation omitted); *accord Germann*, ¶ 27.   "These 'background principles' and 'rules and understandings' focus on the nature of the citizen's relationship to the alleged property, such as whether the citizen had the rights to exclude, use, transfer, or dispose of

18

the property." *Members of the Peanut Quota Holders Assn. Inc. v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005), *cert. denied* 126 S. Ct. 2967 (2006).

¶34    The District Court found that the Licenses were not compensable property interests.  The gist of the District Court's reasoning was that the Licenses are more akin to privileges, and not vested property interests which could be subject to a taking.  The District Court noted that this view was generally consistent with prevailing authority.  Moreover, the District Court found no case law for the proposition that a taking of a license occurs when a new regulatory requirement, or in this case a regulatory prohibition, "ma[kes] the licensed business less profitable than it had been prior to the new regulations."  Further, the District Court observed that "[w]hen state law creates the privilege of holding a license to engage in a heavily regulated business like game farming is in Montana, it need not pay compensation when it changes the conditions under which that privilege may be exercised."  Simply put, appellants possess no common law property right to the Licenses, and the State retained the power at all times to revoke or changes those Licenses if it chose to do so.

¶35    Similarly, the District Court found that appellants' intangible business assets (i.e., the goodwill and going-concern value of their Game Farms) were not compensable property interests in the regulatory takings context.  The District Court, citing to *Andrus v. Allard*, 44 U.S. 51, 100 S. Ct. 318 (1979), among others, noted precedent weighed heavily against the notion that loss of future profits, without more, provided a basis for a takings claim.  The District Court concluded that appellants cited no case law "for the proposition that loss of future business opportunity is a compensable property interest

19

under the Fifth Amendment." Moreover, the District Court noted that the ability to operate a Game Farm was not a common law right, and that because this ability was wholly dependent upon legislative permission, the State was not required to pay compensation for any business loss resulting from I-143.

¶36 Appellants' challenge these conclusions. Generally speaking, appellants argue that Licenses, goodwill, and going-concern value are property interests recognized under Montana law. As such, they argue it was incorrect for the District Court to simply conclude that they could not be taken as a result of the regulatory change occasioned by I-143. Appellants urge us to reverse the District Court on this point, find these interests were compensable, and then correctly apply the *Penn Central* or *Lucas* takings analysis.

¶37 In cases where there is a "mix" of property interests, it is appropriate, if warranted under the circumstances, to consider those interests separately in a takings analysis. *See Conti v. United States*, 291 F.3d 1334, 1340-43 (Fed. Cir. 2002), *cert. denied* 537 U.S. 1112 (2003); *Maritrans*, 342 F.3d at 1352-53. That was the approach applied by the District Court and we will follow it here. Moreover, it is critical to bear in mind throughout our discussion that appellants bear the burden of proving a taking has occurred. *Mohlen*, 74 Fed. Cl. at 660.

**A. Licenses as Compensable Property Interests**

¶38 Generally speaking, a license is simply a right or privilege granted by a sovereign authority to engage in certain activity. 53 C.J.S. *Licenses* § 2, 441-42 (West 2005); *Members*, 421 F.3d at 1333 (stating that a fishing license "is merely a representation by the government that it will not interfere with the licensee's efforts to catch fish."). "A

20

license is a right granted by some competent authority to do an act which, without such license, would be illegal." *Beard v. City of Atlanta*, 86 S.E.2d 672, 676 (Ga. App. 1955). In a similar context, we have stated that "[a] license is a grant by a government authority or agency of the right to engage in conduct that would be improper without such a grant. The conferment of a license . . . is merely a privilege . . . ." *Wallace v. Mont. Dept. of Fish, Wildlife and Parks*, 269 Mont. 364, 368, 889 P.2d 817, 820 (1995) (quotation omitted, ellipsis in original).

¶39    At the same time, courts have recognized that some licenses may contain property interests that go beyond their status as a "mere privilege."  "[A] license may implicate property interests.  A license holder, for example, may acquire a property right protected by the Constitution's Due Process Clause.  A professional license may be property for the purposes of equitable distribution.  A license may be transferrable and may be worth a substantial sum to its holder." *United States v. Berg*, 710 F. Supp. 434, 437 (E.D.N.Y. 1988) (citations and footnote omitted).  In *State v. Pyette*, 2007 MT 119, 337 Mont. 265, 159 P.3d 232, for instance, we observed that a state-issued driver's license constitutes a property interest for purposes of due process. *Pyette*, ¶ 13.  Similarly, in *United States v. Dicter*, 198 F.3d 1284 (11th Cir. 1999), the Eleventh Circuit Court of Appeals found that a medical license was considered "property" for the purposes of a federal drug forfeiture statute, 21 U.S.C. § 853, in reliance upon Georgia case law to the effect that a state-issued license to practice medicine constituted a valuable property right. *Dicter*, 198 F.3d at 1290; *See also Goldberg v. Kelly*, 397 U.S. 254, 262 n. 8, 90 S. Ct. 1011, 1017 n. 8

21

(1970) (discussing increasing tendency in modern society to recognize property rights in government-conferred entitlements and licenses).

¶40    However, as the District Court recognized, appellants' arguments generally fail to appreciate the critical distinction between what might be considered property for purposes of due process, and what types of interests are considered compensable under the Fifth Amendment or Article II, Section 29.   Appellants have cited cases such as *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1976) and *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994) which demonstrate that licenses can be property for purposes of due process.   But none of these cases are helpful or relevant in this context.   "Care . . . must be exercised not to analogize what is 'property' for purposes of the Takings Clause and what might be viewed as a 'property interest' under the Due Process Clause, as the two concepts are dissimilar."  *Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 372 n. 27 (Fed. Cl. 2004).   Without belaboring the point, suffice it to say that reliance on due process cases to prove a particular property interest is compensable for purposes of a takings analysis is simply misplaced.   *See Kizas v. Webster*, 707 F.2d 524, 534-40 (D.C. Cir. 1983) (demonstrating that property interests for purposes of due process are not equivalent to compensable interests under the Takings Clause).

¶41    Courts which have directly considered the question at bar have taken a dim view of the notion that government-issued licenses are compensable property interests.  *See United States v. Fuller*, 409 U.S. 488, 93 S. Ct. 801 (1973) (grazing permit not a compensable property interest); *accord Stevens Co. v. United States Dept. of Interior*, 507

F. Supp. 2d 1127 (E.D. Wash. 2007); *Conti*, 291 F.3d at 1342 (no compensable property interest in a government-issued fishing license); *accord Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1374 (Fed. Cir. 2004), *cert. denied* 545 U.S. 1139 (2005); *accord Arctic King*, 59 Fed. Cl. at 371; *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 439-40 (8th Cir. 2007) (no compensable property interest in a state-issued license to operate lottery machines).  As noted by the District Court, appellants presented no authority under takings jurisprudence to counter this view.

¶42    Nevertheless, compensable property interests can exist in government-issued licenses or permits if they are free from "express statutory language precluding the formation of a property right in combination with the presence of the right to transfer and the right to exclude."  *Members*, 421 F.3d at 1331.  In *Members*, the Federal Circuit Court of Appeals considered a takings claim brought by members of the Peanut Quota Holders Association, Inc. (Members).  The Members had been long-time participants in a government-established program entitling them to receive quotas to grow specific quantities of peanuts.  Under the program, the Members were able to lease or sell their quotas to other farmers.  One of the significant benefits the Members enjoyed as a result of this arrangement was the ability to secure favorable loan rates.

¶43    The Members were initially peanut farmers, but over time they ceased to grow peanuts while retaining their right to sell and lease their peanut quotas.  In 2002, Congress changed the peanut quota program, allowing only individuals who actually farmed peanuts to participate.  Because the Members lost their ability to receive quotas, they lost the favorable loan rates they had formerly secured.  The Members argued that

23

the change in the program, which prevented them from participating in it, constituted a taking of these favorable loan rates. *Members*, 421 F.3d at 1325.

¶44    The primary issue before the Court of Appeals was whether the quotas were compensable property interests under the Fifth Amendment. To address this question, the Court of Appeals turned to the seminal cases in this area for guidance, including *Fuller*, *Conti*, *Am. Pelagic*, and *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993), *cert. denied* 511 U.S. 1106 (1994).[6] First, the Court noted that "[t]he right to transfer is a traditional hallmark of property" and that the quotas were indeed transferable. *Members*, 421 F.3d at 1332. Then the Court considered whether the quotas gave the Members the "right to exclude," observing that "[t]he Supreme Court has recently recognized that the right to exclude is 'perhaps the most fundamental of all property interests.' " *Members*, 421 F.3d at 1333 (quoting *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082 (2005)). The Court observed a critical distinction between licenses generally and the quotas before it. The quotas were "considerably more concrete" than, for instance, a license to fish because such a license "is merely a representation by the government that it will not interfere with the licensee's efforts to catch fish." *Members*, 421 F.3d at 1333. In other words,

> [s]o long as the government retains the discretion to determine the total number of licenses issued, the number of market entrants is indeterminate. Such a license is by its very nature not exclusive. Neither the fisherman nor the firearms salesman can exclude later licensees from entering the market, increasing competition, and thereby diminishing the value of his license.

---

[6] *Mitchell Arms* is discussed *infra* at ¶ 58.

*Members*, 421 F.3d at 1334.

¶45    The peanut quotas conferred the "right to exclude" because the quotas themselves "represented a right to plant and produce a certain amount of peanuts at a certain price in specific crop years." *Members*, 421 F.3d at 1334. In other words, the quota program conferred upon "the peanut quota holders . . . an excludable interest, because the peanut quota program isolated their particular interest from competition." *Members*, 421 F.3d at 1334. Ultimately, in spite of the fact that the quotas were compensable property interests, the Court of Appeals found that the government was under no constitutional duty to compensate the Members because neither the statute, nor the surrounding circumstances, indicated that the quotas were irrevocable, and the government always maintained "its right to withdraw those benefits or qualify them as it chooses." *Members*, 421 F.3d at 1335.

¶46    As stated in *Members*, to qualify as compensable property interests, the Licenses must be transferable, exclusive, and free of any "express statutory language precluding the formation of a property right . . . ." *Members*, 421 F.3d at 1331. We address each of these requirements in turn, as they apply to the Licenses before us.

¶47    With respect to whether the Licenses were transferrable, we note that § 87-4-412(2), MCA (1999), gave the licensee the right to transfer the Licenses subject to FWP approval. According to the statute, FWP did not have broad discretion to deny the transfer assuming the transferee complied with the statutory requirements of part 4. Section 87-4-412(2), MCA (1999). Before the passage of I-143, the Licenses were transferable.

25

¶48    It is arguably a closer question as to whether the Licenses were free of any express statutory language that would prohibit the formation of a compensable property interest in the License itself. Neither part 4 nor the Licenses themselves contain the type of express "disclaimer" language discussed in cases like *Fuller*, *Conti*, or *Am. Pelagic*. *See Fuller*, 409 U.S. at 489, 93 S. Ct. at 803 (quoting 43 U.S.C. § 315b); *Conti*, 291 F.3d at 1341-42 (citing 16 U.S.C. § 1853(d)(3)(D), (d)(2)(A)); *Am. Pelagic*, 379 F.3d at 1374 (citing 15 C.F.R. § 904.301(a)). In all of those cases, there was language in the enabling regulations or statutes which expressly disclaimed that the licenses or permits themselves created any compensable property interests.

¶49    However, part 4 does put the holder on notice that continued compliance with applicable laws and regulations is required for maintenance of the License. *See* ¶ 8. Both versions of part 4 state that the licensee may breed, harvest, sell, or dispose of alternative livestock, so long as she "complies with the requirement of this part." Both versions of part 4 specifically state that FWP may revoke the Licenses if the operator fails "to operate an alternative livestock ranch according to the provisions of this part, rules adopted under this part, or stipulations of the alternative livestock ranch license." Section 87-4-427(1)(a), MCA. Thus, nothing in part 4 limits the ability or discretion of FWP or the State to make changes to the statute. Additionally, the Licenses issued to all appellants stated that they were subject to the "general requirements of the game farm statutes and rules for Montana Fish, Wildlife, & Parks and the Montana Department of Livestock. . . ."

¶50 More importantly, nothing in the Licenses or part 4 expressly revokes the ability of the State to alter those Licenses via duly enacted statutory amendments or changes. In this regard, we note the operation of § 1-2-110, MCA, entitled "All statutes subject to repeal," which states: "Any statute may be repealed at any time except when it is otherwise provided therein. Persons acting under any statute are deemed to have acted in contemplation of this power of repeal." Section 1-2-110, MCA. As the District Court correctly held, the ability to operate a Game Farm is not a common law right incident to the ownership of real property, and is legal only by virtue of legislative enactment. "That the ownership of wild animals is in the state, held by it in its sovereign capacity for the use and benefit of the people generally, and that neither such animals nor parts thereof are subject to private ownership except in so far as the state may choose to make them so, are principles now too firmly established to be open to controversy." *Rosenfeld v. Jakways*, 67 Mont. 558, 562, 216 P. 776, 777 (1923). Assuming any statutory amendment is lawful, there is no legal authority which would restrict the State from making amendments to part 4 in the interests of further regulating the Game Farm industry. As the Federal Circuit Court of Appeals stated in *Members*,

> [t]he government is free to create programs that convey benefits in the form of property, but, unless the statute itself or surrounding circumstances indicate that such conveyances are intended to be irrevocable, the government does not forfeit its right to withdraw those benefits or qualify them as it chooses.

*Members*, 421 F.3d at 1335.

¶51 However, even assuming arguendo it is a closer question as to whether part 4 and the Licenses are actually free of express language prohibiting the formation of a

27

compensable property interest, we do not need to resolve that question to conclude the Licenses are not compensable property interests, because they undoubtedly lack the most significant of all the indicia discussed in *Members*: the right to exclude. "In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government." *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991).

¶52 Nothing in the language of the Licenses or either version of part 4 gives the License holders the right to exclude others from the Game Farm industry. There was no limit to the number of Licenses which could be issued by FWP, and so the appellants were never given the "right to exclude" by virtue of their Licenses. The License holders in this case received a representation by the State that it would not interfere with their efforts to operate Game Farms, so long as they complied with the requirements of part 4. However, none were assured of freedom from competition, and none of the Licenses conferred upon appellants a discrete segment of the Game Farm industry in Montana.

¶53 Moreover, as is conceded by all parties in this case, the Game Farm industry was highly regulated due to concerns over the damaging impact of CWD. *See* ¶¶ 2, 8. As the Federal Circuit noted in *Members*, "when a citizen voluntarily enters into a market subject to pervasive government control, he cannot be said to possess the right to exclude." *Members*, 421 F.3d at 1331. While the appellants certainly had the right to exclude others from fee-shooting on *their* property, that right was not due to the Licenses, but due to their inherent rights in the real property on which those operations were conducted. *See Presley v. City of Charlottesville*, 464 F.3d 480, 492 n. 2 (4th Cir. 2006)

28

(stating that "perhaps the most important aspect of real property ownership [is] the right to exclude others from one's property.") (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80, 100 S. Ct. 383, 62 L.Ed.2d 332 (1979)).

¶54    Accordingly, because the Licenses did not meet the three required criteria for compensability under *Members*, we conclude the District Court did not err when it held the Licenses were not compensable property interests under the Fifth Amendment of the U.S. Constitution, or Article II, Section 29 of the Montana Constitution.

**B. Appellants' Intangible Business Assets**

¶55    We turn now to the District Court's conclusion that I-143 did not take appellants' intangible business assets.   We start with the proposition that intangible assets are statutorily recognized forms of property in Montana, and possess the indicia of property which the Licenses do not.  *See* Section 70-1-104(4), MCA; *In re Marriage of Hull*, 219 Mont. 480, 484-85, 712 P.2d 1317, 1320-21 (1986).  However, this does not necessarily mean that such intangibles can be "taken" in the regulatory context.  In its order, the District Court stated that "[a]n intangible interest in a business has never been held to be a proper subject of a regulatory taking claim."  This is true.  While goodwill and going-concern value can be taken as a result of government condemnation, appellants point to no cases where a taking of going-concern or goodwill has been found in the regulatory takings context.

¶56    In *Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S. Ct. 1434 (1949), the Supreme Court established that, under limited circumstances, intangible assets like going-concern value can be taken in a manner requiring just compensation be paid to the owner.

29

There, the Supreme Court held that when the government temporarily condemned a laundry plant, it was required to compensate plaintiffs for the going-concern value of trade routes. *Kimball*, 338 U.S. at 11-16, 69 S. Ct. at 1440-43. However, since *Kimball* was decided, courts have found these types of takings only in those rare circumstances where the government actually intends to take over the claimant's business and thereby appropriate the goodwill and going-concern value for its own use. Thus, the federal district court for the Eastern District of Michigan held no compensation was due for loss of going-concern value to a claimant's trucking business as a result of a government condemnation of land, because the claimant did not demonstrate that the government condemned the land with the intent of operating a similar business. *United States v. Five Parcels, 1.11195 Acres of Land, More or Less, Situated in the City of Detroit, Wayne County, State of Michigan*, 765 F. Supp. 1283, 1286 (E.D. Mich. 1991). The federal district court for the Western District of Michigan stated the general approach to these questions as follows:

> The Court concludes that where, as in this case, 1) the government intends to construct facilities in substitution for an existing business; 2) the new business is operated under the government's pervasive regulation; 3) the government creates a monopoly situation and realizes a pecuniary interest by doing so, the government's activity is tantamount to the operation of the ongoing concern which, in turn, comprises a business taking.

*United States v. 0.88 Acres of Land*, 670 F. Supp 210, 213 (W.D. Mich. 1987).

¶57 As the jurisprudence in this area makes plain, taking of goodwill or going-concern value differs markedly from other types of taking. This is likely because what the

claimant alleges has been "taken" is an expectation of future profitability.[7]   As the United States Supreme Court stated in *Andrus*, a "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim.   Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform."   *Andrus*, 444 U.S. at 66, 100 S. Ct. at 327.   In cases such as *Kimball*, where there is an actual physical occupation of land by the government, fundamental property rights are implicated; thus, if the going-concern value is based upon a right or ability to exclusive use of the property which the government is occupying, it makes sense to provide compensation for the value lost. Turning to this case, it is important to note that appellants cite no authority for the proposition that compensation of the loss of their intangible assets should be paid under their regulatory takings claims.   Any citation to *Kimball* is unavailing for the simple reason that *Kimball* involved actual physical occupation of land—a critical fact which is absent in this case.

¶58    An expectation of profitability in a highly regulated field of business, where a license or permit is required for participation, is virtually never, in and of itself, considered a compensable property interest.   In *Mitchell Arms,* for instance, the Federal Circuit Court of Appeals found that an arms dealer had no cognizable property interest in an expectation of selling assault rifles in domestic commerce, because that right was

---

[7] Black's defines "going-concern value" as "value of a commercial enterprise's assets or the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or its assets."  *Black's Law Dictionary* 1587 (Bryan Garner ed., 8th ed. 2004).  "Good will" is defined in part as "the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets."  *Black's* at 715.

totally dependent upon the government's granting him a license to sell those weapons. *Mitchell Arms*, 7 F.3d at 217. Thus, when the government withdrew the permit, the arms dealer had no basis upon which to assert a takings claim because all the government " 'took' . . . [was] the ability to realize an expectation in the ultimate market disposition of the rifles. This 'collateral interest' incident to [the] ownership of the rifles is not property protected by the Fifth Amendment." *Mitchell Arms*, 7 F.3d at 217; *See United States v. Gen. Motors Corp.,* 323 U.S. 373, 378, 65 S. Ct. 357, 360 (1945) ("[T]he Fifth Amendment concerns itself solely with the 'property,' i.e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership.").

¶59    Similarly, in *Allied-General Nuclear Servs. v. United States*, 839 F.2d 1572 (Fed. Cir. 1988), the Federal Circuit Court of Appeals found that a private company which had been induced by the federal government to invest $200 million dollars into the development of a nuclear power plant, had no takings claim when the government suddenly changed its mind and decided that the construction of the plant would represent a danger to national security. *Allied-General*, 839 F.2d at 1576-78. The Court of Appeals noted that the licensing power of the government when "use[d] for purposes within the object of the power reserved will be valid even if detrimental to the owner's full utilization of the property." *Allied-General*, 839 F.2d at 1577 (citing *Nollan v. California Coastal Commn.*, 483 U.S. 825, 832-35, 107 S. Ct. 3141, 3146-47 (1987)). The appeals court rejected the notion that excessive inducement from the government to enter into this area and expend significant amounts of money should alter its conclusion,

32

finding that in the absence of a direct contract between the government and the private corporation, the expectation of profiting in such a highly regulated and risky field could not by itself be considered a compensable property interest. *Allied-General*, 839 F.2d at 1577-78. More recently, in *Hawkeye Commodity*, the Eighth Circuit found that a company had no property interest in a right to continued operation in the state-regulated lottery business. *Hawkeye Commodity*, 486 F.3d at 439-40. Thus, when the state of Iowa enacted legislation which prohibited a particular type of lottery game, the company, which had been previously engaged in that type of business, had no basis for a takings claim. *Hawkeye Commodity*, 486 F.3d at 440.

¶60 Similarly, in *Huntleigh USA Corp. v. United States*, 75 Fed. Cl. 642 (Fed. Cl. 2007), the Federal Claims Court found no compensable property interest when the government federalized airport screening in 2001 under the Aviation and Transportation Security Act (ATSA), and allegedly "took" the company's entire screening business, including its "contracts, goodwill and going concern value." *Huntleigh*, 75 Fed. Cl. at 645. The Claims Court concluded it was immaterial whether the private company could have anticipated the regulatory changes, because the federal government retained the ability at all times to make those regulatory changes. *Huntleigh*, 75 Fed. Cl. at 646. In *Huntleigh USA Corp. v. United States*, 525 F.3d 1370 (Fed. Cir. 2008) (*Huntleigh II*)—a case cited, but not discussed or analyzed by the Dissent at ¶¶ 167, 168, 201—the Federal Court of Appeals affirmed the claims court decision in *Huntleigh*. In affirming the lower court, the court noted that Huntleigh's argument was not whether the government actually "took" its screening contracts—because there was no physical condemnation or

occupation by the ATSA—but rather whether the regulatory change embodied in the federalization of airport screening under the ATSA "rendered the contracts and the going concern value and goodwill associated with Huntleigh's security screening business worthless." *Huntleigh II*, 525 F.3d at 1379. When Congress federalized airport screening under the ATSA "it effectively eliminated the market for [Huntleigh's services], given that it concentrated all screening functions in the federal government. Thus . . . Huntleigh and the other airlines with which it had contracts treated their contracts as terminated upon the government's full assumption of screening functions at airports, resulting in considerable loss of business to Huntleigh." *Huntleigh II*, 525 F.3d at 1375.

¶61     However, while the ATSA frustrated Huntleigh's business expectations, it did not take any of Huntleigh's property within the meaning of the Fifth Amendment. *Huntleigh II*, 525 F.3d at 1380-82. Accordingly, the Federal Court of Appeals distinguished the application of *Kimball* as follows:

> Our reasoning applies to all property interests possessed by Huntleigh, including its contracts and any going concern value or goodwill associated with its security screening business. Thus, the authority of *Kimball Laundry* does not alter our holding. Though going concern value and goodwill are indeed compensable property interests, *Kimball Laundry*, 338 U.S. at 11, 69 S.Ct. 1434, those property interests, like Huntleigh's contracts, were merely "frustrated" by the government's enactment of ATSA. They were not taken. Moreover, going concern value is a property interest that has been held to be compensable in the context of a temporary, but not a permanent, taking.

*Huntleigh II*, 525 F.3d at 1382 n. 3.

34

¶62 Huntleigh's unsuccessful argument is nearly identical to that advanced by the appellants. It is indisputable that in the enactment and enforcement of I-143, the State has not "appropriated for its own use any property owned by [the appellants]." *Huntleigh II*, 525 F.3d at 1381. Thus, I-143 did not physically appropriate or "take" any of the appellants' property, although it did eliminate the in-state market for fee-shooting and had a significant impact upon the value of their businesses.

¶63 In this case, appellants have alleged a taking of their intangible business assets because I-143 eliminated the in-state market for fee-shooting. In other words, I-143 has "taken" appellants' ability to profit from fee-shooting. Yet, as is clear from the foregoing authorities, these interests are not compensable in this case under the Fifth Amendment or Article II, § 29 of the Montana Constitution because there has been no physical condemnation or occupation of appellants' property by the State. We disagree with appellants' assertions that the District Court was splitting hairs by not considering the economic impact on the intangible aspects of their businesses and licenses. The District Court correctly recognized that takings claims for goodwill and going-concern value have never been recognized in the regulatory taking context. The unique circumstances required to assert a taking of these intangible assets, namely a physical condemnation of some sort by the State, are not present in this case.

¶64 Accordingly, the District Court did not err when it found that appellants were not entitled to compensation for damage to the goodwill and going-concern value of their businesses as a result of I-143.

¶65    **Issue Two:** *Did the District Court err in concluding that the enactment and enforcement of I-143 did not amount to a taking of appellants' real and tangible personal property under the Fifth Amendment and Article II, Section 29 of the Montana Constitution?*

¶66    We now address appellants' contention that I-143 effected a regulatory taking of their real and personal property—*i.e.,* their land and attached fixtures, and their livestock. There is no question that a person has a compensable property interest arising out of the ownership of such real and personal property.

¶67    Once a claimant establishes a compensable property interest, "the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public." *Members*, 421 F.3d at 1330. Initially, courts assumed that "the Takings Clause reached only a direct appropriation of property, or the functional equivalent of a practical ouster of [the owner's] possession." *Lucas*, 505 U.S. at 1014, 112 S. Ct. at 2892 (citations and quotations omitted, alterations in original). In the modern world, it is well-established that state action or regulation may go "too far," and constitute a taking, in the absence of physical invasion or outright appropriation. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414-15, 43 S. Ct. 158, 159-60 (1922).[8] These so-called "regulatory takings" fall into one of two categories.

---

[8]    Curiously, the Dissent criticizes the Court for claiming that regulatory takings were not recognized prior to *Pennsylvania Coal* in 1922. (Dissent at ¶¶ 140-141.) However, this statement is both historically accurate and well-established.

> [U]ntil the Court's watershed decision in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), "it was generally thought that the Takings Clause reached *only* a 'direct appropriation' of property, or the functional equivalent of a 'practical ouster of [the owner's] possession.' " *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120

> First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e]" of her property. *Lucas*, 505 U.S., at 1019, 112 S.Ct. 2886 (emphasis in original).

*Lingle*, 544 U.S. at 538, 125 S. Ct. at 2081.

¶68    In other words, aside from an outright physical invasion, a "categorical taking" is deemed to have occurred when a regulation or state action forces an owner " 'to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle  . . . .' " *Seven Up Pete*, ¶ 21 (quoting *Lucas*, 505 U.S. at 1019, 112 S. Ct. at 2895).  Thus, when land or other interests retain economic value, no categorical taking has occurred.  *Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 330-32, 122 S. Ct. 1465, 1483-84 (2002).

¶69    However, even when a compensable property interest still retains economic value, just compensation may be required if " 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659.  Determining when such compensation is required is essentially an "ad

---

> L.Ed.2d 798 (1992) (citations omitted and emphasis added; brackets in original); see also *id.*, at 1028, n. 15, 112 S.Ct. 2886 ("[E]arly constitutional theorists did not believe the Takings Clause embraced regulations of property at all").

*Lingle*, 544 U.S. at 537, 125 S. Ct. at 2081.

hoc, factual inquiry" based on the circumstances of each case. In *Penn Central*, the Supreme Court suggested that courts examine the following factors in the course of making this determination: (1) the character of the governmental action; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant. *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659. While courts may consider all three factors, in some cases one or more are dispositive. *E.g., Ruckleshaus*, 467 U.S. at 1005-06, 104 S. Ct. at 2874 (finding the reasonable investment-backed expectation prong dispositive under *Penn Central* analysis).

¶70    In jurisprudence under *Penn Central*, courts have fleshed out the practical meaning of each of these factors. In analysis of the first factor, the "character of the governmental action," the inquiry focuses primarily on "whether the [governmental action] amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good . . . .' " *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082 (quoting *Penn Central*, 438 U.S. at 124). In *Lingle*, the United States Supreme Court clarified that under the "character of the governmental action" prong of the *Penn Central* regulatory takings analysis, whether a challenged regulation "substantially advances" a legitimate state interest "is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation." *Lingle*, 544 U.S. at 545, 125 S. Ct. at 2085. While the Supreme Court did not state with perfect clarity how the character of the governmental action is to be measured, it did state that

38

> [T]he "substantially advances" inquiry reveals nothing about the *magnitude or character* of the burden a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners. In consequence, this test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regulatory actions to be challenged under the Clause.

*Lingle*, 544 U.S. at 542, 125 S. Ct. at 2084.

¶71 The rejection of the "substantially advances" formula with respect to the character of the governmental action prong was simply meant to ensure that courts correctly quantify the effect of the regulation in terms of actual property rights and the magnitude of the infringement on those rights. Physical occupations, however slight, automatically require some form of compensation "because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests." *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082. Similarly, the "complete elimination of a property's value" may give rise to a "categorical" or total regulatory takings. *Lingle*, 544 U.S. at 539-40, 125 S. Ct. at 2082. Regulatory takings, by contrast, turn more on the magnitude of the economic impact and "the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540, 125 S. Ct. at 2082. Thus, under the "character of the governmental action" prong courts should inquire concerning the magnitude or character of the burden imposed by the regulation, and determine whether it is functionally comparable to government appropriation or invasion of private property.

¶72 Under the "reasonable investment-backed expectations" factor, the claimant's expectation must be "reasonable . . . [and] must be more than a unilateral expectation or an abstract need." *Ruckleshaus*, 467 U.S. at 1005-06, 104 S. Ct. at 2874 (quotation omitted). This factor limits takings claims to those who can "demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1190 (Fed. Cir. 2004) (quotation omitted). "This factor also incorporates an objective test—to support a claim for a regulatory taking, an investment-backed expectation must be 'reasonable.'" *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed. Cir. 2003). Under the third criteria, "economic impact," the court measures the impact of the regulatory change by considering "the change in the fair market value of the subject property caused by the regulatory imposition—in other words, the court must 'compare the value that has been taken from the property with the value that remains in the property.'" *Arctic King*, 59 Fed. Cl. at 374 (quoting *Keystone*, 480 U.S. at 497, 107 S. Ct. at 1248). In assessing this factor, the court will look at the magnitude of the impact on the "parcel as a whole." *Rose Acre Farms*, 373 F.3d at 1185 (citing *Penn Central*, 438 U.S. at 130-31, 98 S. Ct. at 2662).

¶73 With respect to the land, the District Court found there was no categorical taking under *Lucas* because the evidence showed those lands still retained substantial economic value; indeed, some of those lands even appreciated. The District Court also rejected appellants' arguments that they were entitled to just compensation for these interests under the *Penn Central* analysis. Under the "economic impact" factor, the District Court

40

concluded that appellants did not show that their real estate interests suffered any significant economic impact as a result of I-143, and further that they failed to demonstrate any change in the fair market value of their land as a result of I-143. *See* ¶¶ 13-15.

¶74 The District Court did recognize a substantial economic impact on appellants' alternative livestock; however, it concluded that the economic impact was not severe, in part because none of the appellants reported taxable profit on their tax returns for the years their Game Farms were in operation. Under the "reasonable investment-backed expectations" factor, the District Court acknowledged that appellants' had significant expectations, but noted "their subjective expectation of profit must be legally tempered by the objective reality that they were engaged in a highly regulated and speculative new industry." The District Court concluded all appellants knew the Game Farm industry was highly regulated, that they were allowed to participate in the business because the privilege was extended by the State, and that they knew the regulations could change.

¶75 With respect to the "character of the governmental action," the District Court concluded that I-143 was a valid exercise of the State's police power. The District Court cited to ample authority demonstrating that when a state exercise of police power is valid, "its actions may injure investment-backed expectations with respect to commerce in the goods at issue without having to pay compensation." One line of authority on which the District Court placed particular reliance was a series of prohibition-era cases showing that state action could put an industry completely out of business without having to pay just compensation so long as the state action was a valid exercise of police power. *E.g.,*

*Mugler v. Kan.*, 123 U.S. 623, 8 S. Ct. 273 (1887); *James Everard's Breweries v. Day*, 265 U.S. 545, 44 S. Ct. 628 (1924). Further, the District Court found that I-143 prohibited only one use of the alternative livestock—i.e., charging a fee to shoot them—and that otherwise appellants maintained all their rights and property interests in the alternative livestock. As a result, I-143 left appellants "free to make other economically viable use of their property, removing only one potential use that has been validly deemed to be injurious to public health, safety, and welfare."

¶76 Appellants challenge the District Court's application of each of the *Penn Central* factors. With respect to the economic impact of I-143, appellants assert that the District Court improperly relied on the lack of a taxable profit in their tax returns, and failed to appreciate the impact I-143 had on their alternative livestock and real estate interests.

¶77 Under the "reasonable investment-backed expectations" factor, appellants assert the District Court was wrong to conclude that their expectations were not reasonable, in spite of the fact that the Game Farm industry was highly regulated. They assert that I-143 was not in fact a regulation of the Game Farm industry, but instead a prohibition against Game Farms which destroyed their property. Appellants maintain that they reasonably expected some changes in the regulations governing the Game Farm industry, but that it is not reasonable to expect them to anticipate a regulatory change, based on the whims of Montana voters, which would wipe out the in-state market for fee-shooting. Appellants cite to *Cienega Gardens* and *NRG Co. v. United States.*, 24 Fed. Cl. 51 (Cl. Ct. 1991) in support of their argument under this factor.

¶78 With respect to the "character of the governmental action" factor, appellants criticize the District Court for focusing too much on whether I-143 was a valid exercise of the State's police power, and too little on the actual purpose behind takings jurisprudence: to prevent the government from forcing a few individuals to bear an economic burden which should be borne by society as a whole. In light of *Lingle*, appellants' argue it is legally inappropriate to conduct a "means-ends" analysis to determine whether I-143 substantially advances legitimate state interests. Instead, they argue, the proper focus should be on the nature of the interference with appellants' property interests and whether I-143 requires appellants to unfairly shoulder the economic burden of eliminating the in-state market for fee-shooting.

¶79 With these arguments in mind, we will examine the appellants' remaining compensable property interests under the *Penn Central* factors.

## C. Appellants' Real Estate Interests and Fixtures

¶80 The District Court correctly determined that I-143 did not effect a taking of appellants' real estate interests, including appellants' land and the fixtures constructed for the purpose of operating Game Farms. In this regard, we find the "economic impact" factor dispositive because Appellants presented no evidence to support their claims that I-143 had a measurable economic impact on their lands and fixtures.

¶81 The State presented expert testimony and evidence at trial which showed that the "highest and best use" of appellants' lands were for uses other than Game Farms, and that they all retained significant value in spite of I-143; indeed, most of those lands even appreciated. Other than simply disagreeing with this view, appellants offered no

evidence—such as appraisals of their own—to support the contention that these findings were clearly erroneous. Indeed, appellants' experts admitted at trial that they had conducted no appraisals of the real property or fixtures themselves. Instead, appellants presented expert testimony to the effect that I-143 constituted a categorical taking of their businesses and the Licenses themselves. But the District Court was correct to give no weight to this expert testimony, because those interests are not compensable under the circumstances at bar. Moreover, a review of the expert opinions presented by appellants shows that these experts did not understand how the *Penn Central* takings analysis is actually applied by the courts.

¶82 There was testimony from Mr. Bridgewater that his property was less marketable without an operating Game Farm, but at any rate it is equally true that the Bridgewaters' land had appreciated 100% since its date of purchase. Additionally, while the Kafkas contended that certain restrictive covenants in their title documents precluded the alternative uses which the State's appraisal deemed appropriate, the District Court adequately addressed this issue by taking notice of the fact that these covenants had been removed by the Kafkas and Hill County, and did not impair the marketability of their lands for uses other than Game Farms.

¶83 Applying the "parcel as a whole" standard to appellants' real estate interests, including their land and fixtures, we find that the "economic impact" factor weighs overwhelmingly against finding a compensable taking. Appellants have not shown that I-143 had any economic impact on their lands, and have not presented evidence to counter the weight of the State's evidence. In short, they provide no basis to assert a

taking of their real estate interests, regardless of the weight of the remaining two factors. Accordingly, the District Court did not err in concluding I-143 did not constitute a regulatory taking of appellants' compensable property interests in their lands.

**D. Alternative Livestock**

¶84    Next we turn to appellants' claim that their alternative livestock was "taken" by I-143.  Returning to the *Penn Central* analysis, we will first examine the economic impact of I-143.  In this connection, we agree with appellants that the District Court underestimated the economic impact that I-143 had on their alternative livestock.  Unlike their real estate interests, appellants' have demonstrated that their alternative livestock suffered a significant devaluation as a result of I-143.  Prior to I-143, the Kafkas received approximately $5,000 to $6,000 per head of alternative livestock; after I-143 that figure was reduced to $1,700 to $1,800.  This represented a devaluation of roughly 70%.  The District Court had evidence before it suggesting similar or greater devaluations for both the Bridgewaters and the Boumas, although it did not cite to this evidence in its order. According to the record, the Bridgewaters once had received approximately $8,000 to $9,000 for each head, while after I-143 they sold 160 head to an out-of-state interest for approximately $80,000, representing a price of around $500 per head, or a roughly 95% devaluation.  The Boumas had sold their animals for roughly $5,000 a head before I-143, while after its passage they received $500 per head.  These figures show a devaluation in the neighborhood of 90%.

¶85    Moreover, the facts in the record support the view that this diminished value was insufficient to even cover the cost of raising and maintaining those livestock.  While there

do exist some markets for their alternative livestock either for meat or antlers, or for resale to out-of-state markets, the return from such activities is less than the actual cost of maintaining the alternative livestock. In other words, after I-143, appellants could only sell the alternative livestock at a loss. This factor weighs in favor of finding a compensable taking of appellants' alternative livestock.

¶86 We turn next to the second *Penn Central* factor, the "character of the governmental action." We start with the proposition that I-143 places the economic burden of eliminating Game Farms in Montana squarely on the shoulders of individuals, like the appellants, who have entered into this industry in reliance on the continued legality of fee-shooting. As such, it seems to run afoul of one of the primary policy concerns animating takings jurisprudence, namely the notion that the Takings Clause "bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960). Whatever the rationale for preventing fee-shooting, it is clear that individuals like appellants, and not the public as a whole, are being asked to bear the burden.

¶87 However, the type of intrusion upon the alternative livestock embodied by I-143 is minimal. The animals have not been seized by virtue of I-143—they still belong to the appellants. Moreover, Appellants may still sell their animals to out-of-state markets for any usage, and may even allow others to shoot them in Montana, so long as no fee is charged. It is well-established that regulations which impair or significantly decrease the profitable use of property do not amount to a taking. In *Andrus*, for instance, the

Supreme Court held that an act of Congress which banned the sale and transfer of eagle feathers, did not amount to a taking of the eagle feathers because the property holders still maintained the rest of the bundle of rights, and could still make some minimal use of the eagle feathers. *Andrus*, 444 U.S. at 65-66, 100 S. Ct. at 327. The Supreme Court acknowledged that the act deprived claimants of the ability to make profitable use of the eagle feathers, but declined to find a taking in large measure because they did not have a right, under the Takings Clause to make profitable use of the eagle feathers. "[T]he denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus*, 444 U.S. at 65-66, 100 S. Ct. at 327.

¶88 Thus, the "character of the governmental action" with respect to the animals is minimally intrusive. If the nature of the intrusion was greater and I-143 affected other segments of appellants' bundle of rights in the alternative livestock, such as their right to sell the live animals or slaughter them for market, then this factor might lean more in their favor because appellants, and not the general public, are shouldering this burden. As it stands, however, the intrusion is so slight that this factor must weigh against finding a compensable taking.

¶89 Thus we turn to the final *Penn Central* factor, "reasonable investment-backed expectations." With respect to the alternative livestock, appellants' investment-backed expectations were that they could charge a fee to shoot them. Indeed, that is why they expended significant financial resources on their respective operations to begin with. The

District Court acknowledged these expectations but concluded that they "must be legally tempered by the objective reality that they were engaged in a highly regulated and speculative new industry." While one can maintain reasonable investment-backed expectations in highly-regulated industries, e.g., *Ruckleshaus*, 467 U.S. at 1010-11, 104 S. Ct. at 2877 (finding reasonable investment-backed expectations in the pesticide industry), *United Nuclear Corp. v. United States.*, 912 F.2d 1432, 1436-37 (Fed. Cir 1990) (finding distinct investment-backed expectations in the mining industry), we agree with the view, as articulated by the District Court, that the regulated and speculative nature of a particular industry should be considered in determining whether investment-backed expectations are reasonable. In this case, then, the question becomes whether it was reasonable for appellants to maintain an investment-backed expectation that they would always be able to charge a fee to shoot alternative livestock in Montana, and that the State could or would not interfere with this expectation. We find that such an expectation is not reasonable; thus, this factor weighs against finding a compensable taking of appellants' alternative livestock.

¶90     In this regard, the facts at bar distinguish this case from both *Cienega Gardens* and *NRG Co.*, the two cases upon which Appellants rely. In *Cienega Gardens*, owners of low-income apartments sued the government for an unconstitutional taking after Congress nullified their contractual rights to prepay forty-year mortgage loans entered into with the Department of Housing and Urban Development (HUD) after a period of twenty years. *Cienega Gardens*, 331 F.3d at 1323. This congressional action was significant to the owners because so long as they participated in the HUD loan program,

48

they were forced to charge rental rates far below market value. The Federal Court of Appeals agreed and found that the term in their contract with the Government guaranteeing them the right to exit the HUD program after twenty years by paying off their loans was "an explicit and material term of their mortgage contracts [and] simply not a change the . . . Plaintiffs should have anticipated." *Cienega Gardens*, 331 F.3d at 1351.

¶91 Similarly, in *NRG Co.*, the Federal Claims Court found an unconstitutional taking under the Fifth Amendment when Congress cancelled mining prospecting permits held by several private companies. *NRG Co.*, 24 Cl. Ct. at 52-55. In that case, the U.S. Government issued permits to several private companies, but Congress later unilaterally cancelled those permits, and related leases, out of concerns that the proposed mining operations would negatively impact Indian tribes on whose lands those operations would be conducted. *NRG Co.*, 24 Cl. Ct. at 55-56. In analyzing the companies' regulatory takings claims, the Claims Court found the companies had reasonable investment-backed expectations that, once they obtained the permits, they would have the option to obtain valuable mineral leases, and that the congressional acts cancelling those permits after they had already been issued was not reasonably within those investment-backed expectations. *NRG Co.*, 24 Cl. Ct. at 61-63.

¶92 Here by contrast, the State never assured appellants they would always be permitted to charge a fee to shoot alternative livestock in Montana. Further, we agree with the District Court that appellants knew, or should have known, that Game Farm operations were highly controversial in Montana and that initiative measures could have

49

been passed which would outlaw Game Farms entirely. The record is clear that FWP was aware of the significant public unrest and imparted this information to the Kafkas beginning in 1996. *See* ¶ 12. Other appellants should have been aware of these same facts. Nothing in the regulations, Licenses, or statutes, provides any assurance that the regulations could not be changed and appellants received no guarantees from the State that their operations would continue to be lawful.

¶93 We conclude that appellants should have reasonably anticipated that the Game Farm industry might be phased out due to health and safety-related concerns over CWD, or even that the State might make the regulatory burden of participating in this field so onerous that Game Farms would no longer be profitable enterprises. In other words, appellants could not maintain a reasonable investment-backed expectation that they would be permanently insulated against the possibility that the Game Farm industry would be either regulated so as to eliminate its profitability, or completely abolished. As a result, since appellants could have reasonably anticipated the complete elimination of Game Farms by the State or regulations that would make participation in the field unprofitable, they should have also anticipated that the State could make the operations less profitable by eliminating the in-state market for fee-shooting. Although appellants may not have specifically anticipated the passage and enactment of I-143, the practical effect of I-143—i.e., the elimination of the in-state market for fee-shooting—should have been within their reasonable investment-backed expectations, given the absence of assurances on this point from the State. Accordingly, the "reasonable investment-backed expectation" factor weighs against finding a compensable taking of appellants' livestock.

¶94 The *Penn Central* test ultimately calls for a weighing or balancing of these factors in order "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082. Utilizing this approach, we have concluded that the purported taking here is not the functional equivalent of a direct appropriation of property, nor does it constitute an ouster from appellants' domain. In weighing these factors together, we are mindful of the admonition that "[r]esolution of each case . . . ultimately calls as much for the exercise of judgment as for the application of logic." *Andrus*, 444 U.S. at 65, 100 S. Ct. at 327. After weighing the effects of I-143 under the *Penn Central* factors, and particularly the "character of the governmental action" factor, we conclude that appellants are not entitled to just compensation for the regulatory taking of their alternative livestock.

## CONCLUSION

¶95 In summary, we affirm the District Court's findings of fact and conclusions of law regarding appellants' claims for compensation with respect to their Licenses, the goodwill and other intangible assets of their businesses, their real estate and fixtures, and their alternative livestock.

/S/ PATRICIA COTTER

We concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ DEBORAH KIM CHRISTOPHER
District Court Judge Deborah Kim Christopher
sitting for Justice John Warner

Justice James C. Nelson, dissenting.

## I. INTRODUCTION

¶96        *We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.*[1]

¶97     Ninety-one years ago, the State of Montana made it a lawful "business or occupation" to acquire, breed, own, harvest, sell, and otherwise control privately owned game animals on alternative livestock ranches. As recently as 1999, the State suggested this as "a viable economic opportunity" for any private property owner, as well as the traditional livestock producers who were interested in diversifying their ranch productivity. Although the State regulated alternative livestock ranching, the regulatory scheme provided that these businesses could continue so long as the owner paid the licensing fee each year and complied with all recording and reporting requirements. Among other things, the State sanctioned "fee shooting," where members of the public could pay to shoot a preselected animal on an alternative livestock ranch under the supervision of a guide. Indisputably, fee shooting was the primary source of income for the alternative livestock businesses.

¶98     With the State's blessing, and in reliance on this governmental enabling, the Kafkas, the Bridgewaters, and the Boumas (collectively, "the Ranchers") invested substantial capital and resources to create going concerns. But then the State turned around and told the Ranchers that while they could continue to acquire, breed, and

---

[1] *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416, 43 S. Ct. 158, 160 (1922).

harvest their alternative livestock, they could no longer charge a fee for hunting the livestock. In thus prohibiting remuneration for the key economic activity on which the Ranchers' businesses depended, the State effectively legislated those businesses out of existence. The State zeroed out the Ranchers' intangible assets (e.g., goodwill and going-concern value) and left them with a collection of tangibles whose value was either worthless or substantially diminished.

¶99 The Court holds today that the Ranchers are not entitled under the United States Constitution or the Montana Constitution to any compensation for the obliteration of their businesses caused by the passage of Initiative No. 143 ("Initiative" or "I-143") in November 2000. The Court acknowledges that the Ranchers suffered substantial property devaluation as a result of the Initiative, but the Court decides that such loss is not compensable because the State did not physically condemn or occupy the Ranchers' property and because the Ranchers should have anticipated a prohibition on charging a fee for alternative livestock hunts. As will surely come as a surprise to many Montana business owners, the Court announces that, absent an explicit "assurance" from the State, the businessman or businesswoman has no reasonable expectation in being able to receive remuneration for the goods and services he or she provides. Thus, when the State says, "Go ahead and market your products, but don't charge anything for them," the business owner is simply out of luck if his or her business is destroyed as a result.

¶100 At bottom, the Court holds that any individual in this State who, with the State's encouragement, invests capital and resources to create a going concern, but who does so in a field that this Court considers "highly controversial," simply has no compensable

2

interest in that business. Therefore, when the State up and decides to legislate the business out of existence—through the unique expedient of depriving the business of any income—the State need not provide any compensation for the owner's loss of property.

¶101 The injustice in treating Montana businesspeople and property owners in this manner is manifest, not to mention legally indefensible. I strenuously disagree with the Court's determination that the Ranchers, and others similarly situated, are without a remedy for a taking of their property. I also cannot subscribe to the Court's faulty rationales in reaching this result. I therefore respectfully dissent from the Court's decision.

## II. PRELIMINARY MATTERS

¶102 The issues in this case are unquestionably complex, in large part because takings jurisprudence itself is "a confused body of law containing contradictory principles and standards." John D. Echeverria & Sharon Dennis, *The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion*, 17 Vt. L. Rev. 695, 696 (1993). The Court, the District Court, the State, and the Sportsmen have further confounded the proper resolution of this case by mischaracterizing the impact of I-143 on the Ranchers' property interests and by injecting into this case a number of inapt legal theories and irrelevant factual matters. For these reasons, and to lay the foundation for my analysis of the Ranchers' claims, I first address the following four subjects:

    A.    The regulatory history of alternative livestock ranching.
    B.    The purpose and impact of I-143.
    C.    Inapplicability of police power/noxious use theory.
    D.    Misplaced reliance on due process considerations.

After clarifying these preliminary matters in Part II, I proceed in Part III with an analysis of the Ranchers' entitlement to just compensation for a taking of their property under the Fifth Amendment to the United States Constitution.

## A. The Regulatory History of Alternative Livestock Ranching

¶103  On March 15, 1917, the Montana Legislature passed an act which, among other things, declared it lawful for any person, company, or association to engage in the "business or occupation" of propagating, owning, and controlling wild game animals of this State upon premises owned, leased, or controlled by such person, company, or association. Laws of Montana 1917, ch. 173, § 84, *as amended*, Laws of Montana 1919, ch. 200, § 1, *codified at* § 3777, RCM (1921). The business owner was required to pay an annual license fee and comply with any regulations prescribed by the State Fish and Game Commission. In addition, a statement of the place where "such business" was to be conducted and the game proposed to be raised on said premises had to be filed with the Commission. Section 3777, RCM. To this end, upon obtaining a permit from the Commission, the business owner was authorized "to capture alive such . . . game quadrupeds as may be necessary for foundation stock for such game farm." Section 3777, RCM. Finally, once the game farm was "in successful operation," the owner was authorized to "sell, transfer, or dispose of the game so bred and raised by him, as he might do with domestic live stock, and without restriction so to do." Section 3777, RCM.

¶104  The statutory scheme underwent a number of revisions in 1925, 1933, and 1947. Most of these changes are not pertinent to the instant appeal, though the following are worth noting. In 1925, the Legislature added an explicit fencing requirement and made it

4

unlawful for any person to enter a properly fenced game farm without the owner's consent. *See* Laws of Montana 1925, ch. 192, § 31. The Legislature also provided that "the product of such game or fur-farm may be dealt with and sold as private property," Laws of Montana 1925, ch. 192, § 31, *codified at* § 3777, RCM (1935); however, this language was not carried forward in the 1947 version of the statute, *see* § 26-1201, RCM (1947). In 1947, the Legislature clarified that a permit must be procured "before" establishing a game farm but that a game farm permit "shall" be issued to "responsible" applicants who own or lease, and have properly fenced, the premises on which their operations are to be conducted. Laws of Montana 1947, ch. 120, § 1. Thereafter, the statutory scheme remained substantially unchanged through 1982.

¶105 In March 1982, Governor Ted Schwinden appointed a 13-member Game Farm Task Force—consisting of sportsmen, game farm operators, bird farm owners, ranchers, and state officials—to develop definitive legislation addressed to concerns about game farming in Montana. The culmination of the task force's work, Senate Bill No. 448 ("SB 448"), was passed by the 1983 Legislature. It repealed the existing game farm laws and replaced them with an entirely new statutory framework. *See* Laws of Montana 1983, ch. 570. Among other things, the new scheme clarified that all game farm animals lawfully raised on a licensed game farm "are the private property of the licensee," § 87-4-414(1), MCA (1983); that the licensee "may acquire, breed, grow, keep, pursue, capture, kill, use, sell, or dispose of the game farm animals and their progeny in any quantity, at any time of year, and in any manner, as long as he complies with the requirements of [Title 87, chapter 4, part 4, MCA]," § 87-4-414(2), MCA; and that the

5

laws applicable to *game* animals do not apply to *game farm* animals on a licensed game farm, § 87-4-414(4), MCA. The hunting and sale of game farm animals was explicitly recognized in §§ 87-4-414(3), -415(1), and -421, MCA. Persons wishing to operate a game farm were still required to obtain a license, *see* §§ 87-4-407, -409, MCA; however, once obtained, renewal of the license was a matter of right "upon payment of the renewal fee if the licensee has not violated any provision under which the license was granted," § 87-4-412(1), MCA. Finally, the reporting requirements were set out in greater detail than previously. *Compare* § 87-4-404, MCA (1981), *with* § 87-4-417, MCA (1983).

¶106  Notably, the original version of SB 448 differed in a number of critical respects from the proposed legislation submitted by the Game Farm Task Force. Among other things, the drafters of SB 448 gave the Department of Fish, Wildlife, and Parks discretion as to whether a game farm license would be issued (assuming the game farm application was otherwise in order) by replacing the word "shall" with the word "may" in several places. The drafters also revised the provision regarding the renewal of licenses such that renewal would not be a matter of right. These sorts of changes prompted a somewhat scathing rejoinder by counsel representing the interests of game farm operators. In a February 1983 letter (which is part of the legislative history of SB 448), counsel pointed out that the proposed legislation submitted by the drafters "violated the intent" of the proposed legislation submitted by the Game Farm Task Force. At stake here, he stated, was "the private property right that every individual has to raise livestock as long as he complies with the other provisions of the Act as was discussed in the task force." Counsel stated that unless the language of SB 448 was amended so that "it represents

6

what the task force agreed upon and does not take away any rights that we negotiated," he would oppose the bill. Ultimately, his concerns were taken into account, and the final version of SB 448 passed by the Legislature, as described above, included the "rights" sought by the game farm operators and negotiated by the Game Farm Task Force.

¶107 The statutory scheme enacted in 1983 remained in place through November 6, 2000 (the day before I-143 went into effect), though various provisions were amended or added over the years. For instance, in 1993, the Legislature adopted new procedures and criteria for the issuance and revocation of game farm licenses, including additional fencing and enclosure requirements, and authorized licensees to transfer their game farm licenses. *See* Laws of Montana 1993, ch. 315, §§ 3, 4, 6, 12. The Legislature also eliminated the "shooting license" that game farmers had been required to obtain before allowing anyone to hunt on their property. *See* Laws of Montana 1993, ch. 315, § 7. In 1999, the term "game farm" was changed to "alternative livestock ranch." *See* Laws of Montana 1999, ch. 574, § 7. In addition, the Legislature added a provision explicitly recognizing the production of alternative livestock as "a viable economic opportunity for any private property owner as well as the traditional livestock producers who are interested in diversifying their ranch productivity." Laws of Montana 1999, ch. 574, § 1.

¶108 The substance of the statutory scheme as it relates to the instant appeal, however, remained substantially unchanged. All alternative livestock lawfully possessed on a licensed alternative livestock ranch were the licensee's "private property," which the licensee could "breed, grow, keep, pursue, handle, harvest, use, sell, or dispose of . . . in any quantity and at any time of year." Section 87-4-414(1), (2) MCA (1999). Annual

7

renewal of the alternative livestock ranch license was a matter of right under § 87-4-412(1), MCA, which instructed the Department of Fish, Wildlife, and Parks to renew each license "upon payment of the renewal fee if the licensee has complied with all recording and reporting requirements." Lastly, each license was transferable if certain criteria were met. Section 87-4-412(2), MCA.

¶109 So, to sum up this historical background, although the regulatory scheme went through a number of adjustments between 1917 and 2000, it was always a lawful "business or occupation" to acquire, breed, own, harvest, sell, and otherwise control privately owned game animals on an alternative livestock ranch. Furthermore, while the regulations designed to protect native wildlife (through safety and fencing requirements) became increasingly detailed and rigorous, so did the regulations designed to protect the business owners' interests (through explicit recognition of their alternative livestock as "private property" and their businesses as "viable economic opportunities," and through the guarantee that their licenses would be renewed each year upon payment of the renewal fee and compliance with all recording and reporting requirements).

### B. The Purpose and Impact of I-143

¶110 On November 7, 2000, the voters passed I-143, which altered the statutory scheme in several significant respects. *See generally* Laws of Montana 2001, 2000 Ballot Issues, Initiative No. 143, §§ 1-9. First, it prohibited the establishment of any new alternative livestock ranches. *See* §§ 1, 4. Second, it revoked the right of existing alternative livestock ranch operators to transfer their alternative livestock ranch licenses. *See* § 4. Lastly, it prohibited "the shooting of game animals or alternative livestock . . . for a fee or

other remuneration on an alternative livestock facility." *See* § 6. These amendments took effect immediately. *See* § 11.

¶111 The Sportsmen have sought in this Court to portray I-143 as creating nothing more than a few "additional restrictions" on alternative livestock ranching. They assert that these "additional restrictions" are not so onerous as to amount to a taking of private property. The District Court likewise characterized I-143 as merely an "extension" of the existing regulatory framework. Remarkably, this Court minimizes the impact of I-143 even further, declaring it to be only a "slight" and "minimally intrusive" burden on the Ranchers' property interests. For the reasons which follow, these characterizations are baseless and patently misleading.

¶112 The Sportsmen inform us that they conceived, designed, and drafted I-143 "to address specific dangers stemming from the proliferation of game farms in this state." They list a number of such dangers: the threat posed by alternative livestock ranches to Montana's "proud heritage of ethical hunting"; the increased risk of disease (e.g., chronic wasting disease), hybridization, and competition to native wildlife posed by alternative livestock interacting with native elk and deer (as a result of escape, or nose-to-nose contact through the fence); and the "European style" privatization of wildlife. The Sportsmen also report that they opposed and sought to prohibit the "penned hunts" offered by many alternative livestock ranches. They note that this practice, which they criticize as "a sport for the wealthy," had become a "poster child" for anti-hunting groups. Finally, although the Legislature took action in 2000 to address concerns over chronic wasting disease—*see* Laws of Montana 2001, May 2000 Special Session, ch. 1

9

(imposing a moratorium on new applications for initial alternative livestock ranch licenses "until a live test for chronic wasting disease is developed and is approved by the department of livestock")—the Sportsmen assert that "the problems" associated with alternative livestock ranches were not "adequately addressed" by the legislative action. The Sportsmen thus characterize I-143 as "vital" to the protection of Montana's wildlife, to the availability of plentiful populations of big game, and to the preservation of Montana's proud tradition of hunting these animals under fair-chase conditions. They conclude that I-143 serves "weighty" and "important" purposes.

¶113 Yet, notwithstanding the Sportsmen's concerns with disease, fair-chase hunting ethics, and privatization of wildlife, the Ranchers' activities remain lawful and state-sanctioned in most respects. I-143 did not revoke their alternative livestock ranch licenses, confiscate their alternative livestock, or impose stricter regulations on the care and management of the livestock. As a matter of fact, the Initiative does not prohibit the Ranchers from continuing to acquire, breed, grow, keep, pursue, handle, harvest, use, sell, or dispose of alternative livestock. Section 87-4-414(2), MCA (2001). The Initiative allows the Ranchers to keep penned elk, in spite of the concern about contact between wild ungulates and alternative livestock and the concern about transmission of diseases through intermediate hosts. The Initiative also allows "penned hunts," in spite of the concern with preserving Montana's tradition of ethical fair-chase hunting. And the Initiative allows private ownership of alternative livestock, § 87-4-414(1), MCA, in spite of the concern over European-style privatization of wildlife. In short, I-143 neither outlawed alternative livestock ranches nor directly addressed any of the concerns cited by

10

the Sportsmen in support of the Initiative. (The Sportsmen's concerns were set out in the Proponents' arguments included with the 2000 Voter Information Pamphlet.) I-143 did not create new regulations concerning fencing, it did not create new testing requirements for diseases, and people can still shoot privately owned penned elk. I-143 actually addressed none of the "weighty" and "important" purposes for which it was promoted to the voters.

¶114 The reason for all of this is simple: The Sportsmen's ultimate goal was to shut down all alternative livestock businesses, and in drafting I-143, they recognized the constitutional implications of doing so outright. As explained by counsel for the Sportsmen during oral argument in the companion case, *Buhmann v. State* (No. 05-473):

> There was a recognition by my clients that if they passed a statute that simply said, "Every game farm is done tomorrow," that that would be a very difficult takings claim to defend against. And we didn't want to have to go down that road. And so the statute was carefully crafted to address the problem in a way that was not offensive to taking but at the same time benefitted the wildlife and the wildlife management of this State.

¶115 Thus, in a striking display of legerdemain, the Sportsmen devised the "carefully crafted" solution of imposing a ban on charging a fee for what remains a lawful activity in this State: shooting alternative livestock on alternative livestock ranches. They recognized that because the value of each alternative livestock business derived from its ability to sell "penned hunts," I-143 would effectively shut those businesses down by prohibiting remuneration for such hunts. Indeed, as the District Court aptly observed: "I-143 does appear to have been intentionally crafted in such a way that would for all intents and purposes snuff out alternative livestock ranching and in the process possibly

11

save the State from footing the bill in the event it was found that the obvious takings were compensable." Likewise, despite its attempts elsewhere in the Opinion to minimize the impact of I-143, the Court acknowledges that the Initiative's prohibition on fee shooting effectively "outlaw[ed] Game Farms entirely." Opinion, ¶ 92. Similarly, the Attorney General's explanatory statement of I-143 in the 2000 Voter Information Pamphlet points out that "[a]bolishing fee shooting may force closure of some game farms." Notably absent from the Voter Information Pamphlet, however, is any acknowledgement that the State might have to foot the bill for destroying the Ranchers' property rights. As a result, the voters were never required to weigh the costs and benefits of taking the Ranchers' property. They were simply asked whether an initiative "prohibiting new game farms, prohibiting transfer of existing game farm licenses, and prohibiting shooting of game farm animals for a fee" should be approved, given the dire public need described by the Proponents.

¶116 In blunt terms, the Sportsmen determined to rid Montana of a perceived blight, but euthanizing the Ranchers outright was thought to be too "offensive" and costly. So, they decided instead to pull the plug on the Ranchers' life-support. That way, they could argue that the Ranchers died of natural causes and that the State, therefore, bears no responsibility. Counsel's assertion that this transparent charade is "not offensive" to the guarantee of just compensation for a taking of private property is dubious, if not preposterous. Moreover, that this ruse was wrapped in the mantle of Montana's "proud heritage of ethical hunting" is a stain on the sport that the Sportsmen purport to protect.

12

¶117 Even more troubling is the Court's decision to ratify this end-around the Constitution's just compensation requirement. This constitutional guarantee is worthless when the Court allows it to be circumvented by means of a "carefully crafted" political ploy. Moreover, the purpose of the constitutional guarantee is undermined when property rights can be devalued with no thought whatsoever as to the burdens and benefits involved. From the taxpayers' perspective, it is easy and painless to vote for an initiative such as I-143 when this Court holds that the government is free to take property without having to pay for it. Yet, if government regulation involves "adjusting the benefits and burdens of economic life to promote the common good," *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978), then taxpayers should be required to weigh the costs of taking property against the expected public benefits of doing so. In point of fact, this weighing is mandated by fairness, efficiency, and the Constitution.

¶118 Given the Sportsmen's goals in drafting I-143, it is disingenuous to argue, as the Sportsmen do, that the Ranchers have not suffered a taking of private property under the "additional restrictions" created by I-143 because the Initiative merely "modified" their alternative livestock ranch licenses and because the Ranchers "can continue operating as a game farm, albeit less profitably." The Court's assertion that I-143 made the Ranchers' operations only "less profitable" is similarly far-fetched. Opinion, ¶ 93. The purpose of I-143, as admitted by the Sportsmen themselves, was not to create a few "additional restrictions" (e.g., new testing and fencing regulations) that might incidentally make the business of alternative livestock ranching less profitable. The Initiative's purpose, rather,

13

was to eliminate the economic viability of these businesses entirely and thereby make it unfeasible for the Ranchers and other alternative livestock business owners to operate their ranches at all. In this connection, the Sportsmen and the Court concede that the Ranchers invested in specialized equipment, inventory, and fixtures and expended significant financial resources to develop their property for the *specific* purpose of fee shooting. Moreover, the Court acknowledges that as a result of I-143, the value of the Ranchers' alternative livestock was diminished to such an extent that the Ranchers are no longer able to cover the cost of raising and maintaining the livestock. Opinion, ¶ 85. Simply put, I-143 was designed to shut down all alternative livestock businesses, and it succeeded in doing so. It is irrelevant that this was accomplished in a less direct and expeditious manner than passing a statute that simply said, "Every game farm is done tomorrow." The result—destruction of the Ranchers' businesses—is clearly the same.

¶119 Ultimately, the Sportsmen's assertion that I-143 served "weighty" and "important" purposes is immaterial to our resolution of this appeal. The District Court and several other courts have already concluded that I-143 furthered legitimate state interests, and the Ranchers have not appealed these conclusions. *See Kafka v. Hagener*, 176 F. Supp. 2d 1037, 1042 (D. Mont. 2001); Or. on Mot. to Dismiss (Dkt. 40) at 4, *Kafka v. Montana Dept. of Fish, Wildlife and Parks*, DV-02-059 (Mont. Dist. Oct. 21, 2002); *Spoklie v. Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005); *see also Hagener v. Wallace*, 2002 MT 109, ¶¶ 22-28, 309 Mont. 473, ¶¶ 22-28, 47 P.3d 847, ¶¶ 22-28. Rather, the point of this discussion is that I-143 was intended to shut down the alternative livestock industry without the State's having to pay for it, and thus the Sportsmen's and the Court's

14

portrayals of I-143 as something other than it is—as merely a slight, minimally intrusive "adjustment" of the regulatory scheme—are implausible. Indeed, they are flat wrong. The Court even contradicts itself by arguing on one hand that I-143 amounts to a "slight" and "minimally intrusive" burden on the Ranchers' property interests, Opinion, ¶ 88, but on the other hand that the Ranchers "should have reasonably anticipated that the Game Farm industry might be phased out," Opinion, ¶ 93. "Phasing out" an entire industry is certainly not the result one would reasonably anticipate from a regulation whose intrusion on property interests is "slight" and "minimally intrusive."

¶120 In any event, the fact is that I-143 did not adjust the regulatory scheme as the amendments over the preceding 83 years had done. Rather, it rendered the regulatory scheme entirely pointless, since none of the businesses in the industry can exist economically after I-143, which was the admitted purpose of the Initiative from the outset.

## C. Inapplicability of Police Power/Noxious Use Theory

¶121 Citing *Mugler v. Kansas*, 123 U.S. 623, 8 S. Ct. 273 (1887), the State argues that "the government can ban commerce that it deems to be injurious to public health, safety, and welfare without having to compensate the traffickers in such commerce for the loss of their businesses." Likewise, during oral argument, the State emphasized the theory that the Ranchers are not entitled to any compensation because I-143 is "a valid police power regulation" necessary for the protection of the public health, safety, and welfare. The State asserted on this basis that this Court has "no choice" but to affirm the District Court's decision.

15

¶122 In rejecting the Ranchers' takings claims, the District Court articulated a similar theory based on *Mugler*:

> The State has the power to determine that certain commerce is injurious to the welfare of the State and its citizens, and to regulate or even outlaw that commerce. The State has done so here with respect to the fee-shooting prohibition in I-143. When the State does so, its actions may injure investment-backed expectations with respect to commerce in the goods at issue without having to pay compensation.

¶123 The Court remarks that "ample authority" supports the District Court's reasoning. Opinion, ¶ 75. According to the Court, this "ample authority" demonstrates the State may put an industry completely out of business without having to pay just compensation, so long as the state action was a valid exercise of its police power. Opinion, ¶ 75. In this connection, the Court observes that the activity targeted by I-143 was " 'validly deemed to be injurious to public health, safety, and welfare.' " Opinion, ¶ 75 (quoting the District Court's conclusions of law). The Court does not identify what the injurious byproducts of charging a fee to shoot alternative livestock were, but it appears that the Court has the Sportsmen's concerns in mind (i.e., diseases, unethical hunting, and private ownership of game animals), given that the Court refers to these repeatedly throughout its Opinion.

¶124 The State insists that *Mugler* is "still viewed as authoritative under modern taking jurisprudence." As authority for this contention, the State cites *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992), *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S. Ct. 1232 (1987), and *Andrus v. Allard*, 444 U.S. 51, 100 S. Ct. 318 (1979). In addition, the State asserted during oral argument that *Mugler* "continues to be cited as good law," since "it was cited last term by the Court in

16

the *Kelo* case"—a reference to *Kelo v. City of New London*, 545 U.S. 469, 125 S. Ct. 2655 (2005). A careful reading of *Kelo*, however, reveals that *Mugler* was cited by one of the dissenting Justices, not by the *Kelo* majority. *See Kelo*, 545 U.S. at 519-20, 125 S. Ct. at 2685 (Thomas, J., dissenting).

¶125  Although the Ranchers, citing *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994), and *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed. Cir. 1991), argue that *Mugler*'s validity is suspect, this debate over *Mugler*'s current vitality is beside the point. For the reasons which follow, *Mugler* is inapplicable to the case at hand.

### 1. The *Mugler* Decision

¶126  At the outset, it is necessary to point out that *Mugler*, which involved a challenge to certain Kansas statutes, was decided on substantive due process grounds. The Fifth Amendment's Takings Clause was not at issue for the simple reason that, under the law at the time, the Clause was understood as "intended solely as a limitation on the exercise of power by the government of the United States, and . . . not applicable to the legislation of the states." *Barron v. Baltimore*, 32 U.S. 243, 250-51 (1833); *accord Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 176-77 (1872). Rather, during the period in which *Mugler* was decided, the "just compensation" requirement (as applied to state action) was a matter of state constitutional law, natural law, common law, and Fourteenth Amendment due process. *See* Kris W. Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L. Rev. 1211, 1229, 1270-76; Bradley C. Karkkainen, *The Police Power Revisited: Phantom Incorporation and the Roots of the*

17

*Takings "Muddle,"* 90 Minn. L. Rev. 826, 847-49 (2006); *see also Chicago, Burlington & Quincy Railroad Co. v. Chicago*, 166 U.S. 226, 236, 17 S. Ct. 581, 584 (1897).

¶127   The question in *Mugler* was whether state statutes prohibiting the manufacture and sale of intoxicating liquors (except for medical, scientific, and mechanical purposes) violated the Fourteenth Amendment's Due Process Clause or Privileges and Immunities Clause. *See Mugler*, 123 U.S. at 657, 8 S. Ct. at 295. In answering this question, the Supreme Court first acknowledged the power of the States, known as the "police power," "to control their purely internal affairs, and, in so doing, to protect the health, morals, and safety of their people by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the Constitution of the United States." *Mugler*, 123 U.S. at 659, 8 S. Ct. at 296. The Court decided that the power to regulate or prohibit the manufacture and sale of intoxicating liquors, whether for general use or merely personal use, was within the ambit of the state's police powers. *See Mugler*, 123 U.S. at 658-63, 8 S. Ct. at 295-98.

¶128   Next, the Court considered and rejected the contention that Kansas was required under the Fourteenth Amendment to pay just compensation for the resulting devaluation of the appellants' breweries. *See Mugler*, 123 U.S. at 664-70, 8 S. Ct. at 298-301. The Court reasoned that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." *Mugler*, 123 U.S. at 665, 8 S. Ct. at 299. Thus, where a particular use of property is a nuisance to the surrounding community, the government may exercise its police power to abate the nuisance. *Mugler*,

18

123 U.S. at 667, 8 S. Ct. at 300. In explaining that no compensation is required in that situation, the Court stated as follows:

> The power which the states have of prohibiting such use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not—and, consistently with the existence and safety of organized society, cannot be—burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner.

*Mugler*, 123 U.S. at 669, 8 S. Ct. at 301.

## 2. *Mugler*'s Inapplicability to the Case at Hand

¶129   Seen in its historical context, *Mugler* stands for the limited proposition that the government need not pay compensation when it exercises its power to prohibit a "noxious" use of property, i.e., a use akin to a "public nuisance." *See Lucas*, 505 U.S. at 1010, 1022-23, 1029-30, 112 S. Ct. at 2890, 2896-97, 2900-01 (explaining that the Takings Clause does not require compensation when the state exercises its power to abate a nuisance which affects the public generally). This is so because the right to engage in the noxious use was never in the property owner's title to begin with; thus, nothing is taken when the state prohibits that use. *See Lucas*, 505 U.S. at 1029-30, 112 S. Ct. at 2900-01. But this proposition gets the State nowhere in its attempt to avoid paying compensation for the Ranchers' losses. Alternative livestock ranching, which was done and maintained under the express authority of Title 87, chapter 4, part 4, MCA, was in no

19

way a public nuisance. *See* § 27-30-101(2), MCA ("Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."). *Mugler*, therefore, is inapposite.

¶130 The State suggested otherwise at oral argument, asserting emphatically and with unmistakable disdain that use of alternative livestock for the purpose of fee shooting threatened the public health, safety, and welfare. Likewise, in its appellate brief, the State disparages the Ranchers' activities as "injurious to public health, safety, and welfare." That the State would describe alternative livestock ranching with such smug intolerance is astounding, given that the State not only sanctioned the industry's existence for 83 years but also facilitated—and even encouraged—the establishment of numerous alternative livestock businesses. Indeed, the State conceded at oral argument that "[t]here is some evidence to suggest that it was the policy of the political branches of government to encourage people to look at game farming as an alternative to traditional agriculture -- actually, to subsidize traditional agriculture so they could stay on the farms and ranches." Yet, at the same time, the State argued that the very activities it had sanctioned and encouraged for 83 years needed to be prohibited in the interest of the public health, safety, and welfare. This is hypocrisy personified.

¶131 The State's condemnation of the alternative livestock industry as some sort of noxious or abhorrent threat to the public health, safety, and welfare rings hollow in light of the State's role in creating, developing, and nurturing the industry in the first place. That said, any suggestion that no compensation is owed the Ranchers because the State was abating some sort of public nuisance is legally unsustainable. Section 27-30-101(2),

MCA. For that matter, the State has provided nothing but conclusory assertions that alternative livestock ranching constituted a public nuisance in the first place.

¶132 On a related point, as noted above, the District Court reasoned:

> The State has the power to determine that certain commerce is injurious to the welfare of the State and its citizens, and to regulate or even outlaw that commerce. The State has done so here with respect to the fee-shooting prohibition in I-143. When the State does so, its actions may injure investment-backed expectations with respect to commerce in the goods at issue without having to pay compensation.

¶133 This reasoning is legally unsustainable. Assuming, arguendo, that I-143 reflects a determination by the State that fee shooting is a noxious use of property, it has long been established that the mere declaration by the government that a certain property or use thereof constitutes a nuisance does not make it so. *See Yates v. Milwaukee*, 77 U.S. 497, 505 (1871); *see also Lucas*, 505 U.S. at 1031, 112 S. Ct. at 2901-02. Addressing such a declaration in *Yates*, the Supreme Court observed:

> It is a doctrine not to be tolerated in this country, that a municipal corporation, without any general laws either of the city or of the state, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property of the city, at the uncontrolled will of the temporary local authorities. Yet this seems to have been the view taken by counsel who defended this case in the Circuit Court; for that single ordinance of the city, declaring the wharf of Yates a nuisance, and ordering its abatement, is the only evidence in the record that it is a nuisance or an obstruction to navigation, or in any manner injurious to the public.

*Yates*, 77 U.S. at 505; *see also Lawton v. Steele*, 152 U.S. 133, 140, 14 S. Ct. 499, 502 (1894) ("[T]he legislature has no right arbitrarily to declare that to be a nuisance which is clearly not so.").

21

¶134 After 83 years of sanctioning alternative livestock ranching, it appears that the State has now decided that this activity is a noxious use of property. However, declaring it to be so does not retroactively make it so. The State may not escape paying just compensation for the Ranchers' losses through the mere expedient of declaring that which formerly was *not* a public nuisance to have been a public nuisance all along.

### 3. Undertone about Alternative Livestock Ranchers

¶135 One final point must be made before concluding this discussion. There exists in the State's and the Sportsmen's briefs, and in the Court's Opinion as well, an undertone that alternative livestock ranchers are bad people who were engaged in an offensive business and deserved to be shut down. This undertone is not properly a part of the takings calculus. Montana has many businesses that strike some citizens as ill-advised or repugnant for one reason or another. Adult bookstores, strip clubs, bars, and casinos are obvious examples, though tobacco companies, insurance companies, oil companies, and power companies are also viewed by many with contempt. Though regulated, we tolerate the existence of businesses and activities that offend some segments of the population as the price for living in a free-market economy and an open society that values entrepreneurial activity. The fact that an individual's lawful business activity is offensive to some, however, does not itself negate the requirement that the State pay just compensation for taking that individual's property.

### D. Misplaced Reliance on Due Process Considerations

¶136 The foregoing discussion leads into the fourth and final preliminary matter: misplaced reliance on due process considerations. Broadly speaking, the issue we must

decide on this appeal is whether the governmental action embodied in I-143 amounted to a "taking" of the Ranchers' property. In answering this question, relevant considerations include "the actual burden imposed on property rights" and "how that burden is allocated." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543, 125 S. Ct. 2074, 2084 (2005). In contrast, whether I-143 "substantially advances legitimate state interests" or is "reasonably necessary to the effectuation of a substantial public purpose" is irrelevant, since such considerations are pertinent to a due process analysis, not a takings analysis. *See Lingle*, 544 U.S. at 540-42, 125 S. Ct. at 2082-84.

¶137 Although the Sportsmen acknowledge that due process tests have "no proper place" in takings analysis, they embark on a lengthy discussion about the legitimacy of I-143, arguing that it is "vital" to the protection of Montana's wildlife and to the tradition of fair-chase hunting. Indeed, the Sportsmen consume roughly a third of their appellate brief expounding on "I-143's purposes and the importance of those purposes." The Sportsmen conclude that the "weighty" and "important" purposes served by I-143 "tip the scales" against the State's having to pay compensation for any diminution in the value of the Ranchers' property.

¶138 Similarly, the State acknowledges that due process precedents "are not especially helpful" in resolving the Ranchers' takings claims. Nevertheless, the State contends that I-143 is "a valid police power regulation that substantially advances a number of important interests." Likewise, the District Court observed that I-143 is "a valid police power regulation that reasonably advances the protection of the health, safety, and welfare of the State and its citizens" and that "[t]he State introduced unrebutted evidence

23

that I-143 advances substantial state interests." The District Court concluded that these factors "weigh heavily against requiring the State to pay compensation here."

¶139 That the Sportsmen, the State, and the District Court have emphasized these sorts of considerations in their respective analyses is not surprising, given that the Supreme Court long analyzed takings claims under substantive due process principles. Such considerations, however, are not instructive of whether property has been taken; indeed, they are completely irrelevant. Thus, as the Ranchers correctly point out, it is improper (for purposes of analyzing their takings claims) to conduct a "means-ends" analysis of I-143 and the District Court, therefore, erred in factoring due process considerations into its analysis. To understand why, it is helpful to begin with some historical background.

### 1. Nineteenth Century Regulatory Takings

¶140 Contrary to the Court's assertion in ¶ 67, the notion of a regulatory taking—where the government regulates private property rights, as opposed to condemning or directly appropriating private property—was recognized in this country long before 1922. Indeed, recognition of this sort of taking may be found in the 19th century decisions of numerous state courts and even the Supreme Court. *See generally* Kris W. Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L. Rev. 1211; Andrew S. Gold, *Regulatory Takings and Original Intent: The Direct, Physical Takings Thesis "Goes Too Far,"* 49 Am. U. L. Rev. 181, 228-38 (1999); Eric R. Claeys, *Takings, Regulations, and Natural Property Rights*, 88 Cornell L. Rev. 1549 (2003); David A. Thomas, *Finding More Pieces for the Takings Puzzle: How Correcting History Can Clarify Doctrine*, 75 U. Colo. L. Rev. 497, 519-33 (2004).

24

¶141   The Court insists that its contrary version of history is "both historically accurate and well-established." Opinion, ¶ 67 n. 8. Yet, tellingly, the Court fails to produce one single shred of historical authority to back up this claim. Rather, the Court merely cites the same demonstrably incorrect historical accounts that the scholars ably refute in their respective articles cited above. The Court apparently fails to recognize that "[the Supreme] Court's opinions frequently make assertions of historical fact, but those assertions are not authoritative as to history in the same way that [the Supreme Court's] interpretations of laws are authoritative as to them." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 106 n. 5, 116 S. Ct. 1114, 1148 n. 5 (1996) (Souter, Ginsburg, & Breyer, JJ., dissenting). Moreover, that the Supreme Court has "repeated [a] mistake does not transform error into truth." *Dickerson v. United States*, 530 U.S. 428, 460, 120 S. Ct. 2326, 2345 (2000) (Scalia & Thomas, JJ., dissenting). If the origins of regulatory takings doctrine is critical to the Court's analysis—and footnote 8 of the Opinion seems to suggest that it is—then it is curious that the Court would ignore authority which plainly refutes its statements in this regard. Not wanting to expend an inordinate amount of time on this point, I note just four of the cases here. Others are discussed in the articles cited above.

¶142   At issue in *People v. Platt*, 17 Johns. 195 (N.Y. Sup. 1819), were statutes that required the owners of dams on certain rivers to alter the dams so that salmon could pass freely over them. Platt, who owned a milldam across a nonnavigable river that flowed through his property, refused to make the required alterations. In considering the case, the court first observed that Platt had a "right to the exclusive enjoyment of the river"

within the bounds of his property. *Platt*, 17 Johns. at 212. The court acknowledged that the legislature had the power to take property for public purposes, but the court reasoned that such appropriations "are constitutional, legal, and justifiable, only when a fair and just equivalent is awarded to the owner of property thus taken." *Platt*, 17 Johns. at 215. Here, the court observed, "no equivalent is offered, or provided, for the loss which must inevitably ensue, upon a compliance with the requirements of the statutes." *Platt*, 17 Johns. at 215. Thus, because the statutes interfered with the usage rights associated with Platt's riparian property, the court held the statutes were void as applied to him, absent payment of compensation.

¶143   In *Woodruff v. Neal*, 28 Conn. 165 (1859), the defendant impounded the plaintiff's cow, which had been grazing along a public highway that passed through the defendant's land. The plaintiff claimed he had the right to depasture his cow along the highway by virtue of a government-issued license authorizing neat cattle to go at large. The court, however, observed that a highway is an easement conferring on the public only a right of passage and that the landowner retains the fee and "all rights of property" in the land. *Woodruff*, 28 Conn. at 167. Among the retained rights, the court noted, was that of "the herbage of the land, which belongs exclusively to him, and having himself thus the right to depasture it, he may maintain trespass against any one who puts his cattle upon it to graze." *Woodruff*, 28 Conn. at 167. Accordingly, in the absence of compensation to the owner of the land upon which the plaintiff's license was to be exercised, the court held that granting the license was "beyond the constitutional power of the legislature." *Woodruff*, 28 Conn. at 169. Notably, a government-authorized permanent physical

invasion of another's private property is now recognized as one of "two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes." *Lingle*, 544 U.S. at 538, 125 S. Ct. at 2081 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking)).

¶144  Lastly, *Walker v. Shepardson*, 4 Wis. 486 (1855), and *Yates v. Milwaukee*, 77 U.S. 497 (1871), involved a wharf that extended from Yates's lot into the Milwaukee River. Under Wisconsin law, a riparian proprietor bounded by a navigable stream owned the land to the center of the stream, subject to a public easement to use the stream for navigation. *See Walker*, 4 Wis. at 508. Furthermore, he had "the right to use [his] land which is covered by the water of the river, in any way compatible with the use of the stream for the purposes of navigation," including constructing docks or landing places for goods or passengers. *Walker*, 4 Wis. at 508-09. The City of Milwaukee, however, established a dock line which, as it passed in front of Yates's lot, was 100 feet away from the navigable channel of the river. In other words, the City prohibited Yates from maintaining a dock over that part of his land between the dock line and the navigable part of the river, though a dock in this location would not have interfered with the public's easement. In so doing, the City rendered this section of his property worthless, and the court held that "it would be necessary to make compensation to the owner for the property which would thus be rendered valueless by this act of the common council." *Walker*, 4 Wis. at 512; *cf. Lingle*, 544 U.S. at 538, 125 S. Ct. at 2081 (a regulation that

completely deprives an owner of "*all* economically beneficial use" of her property is a per se taking (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S. Ct. 2886, 2895 (1992))).

¶145   The City then declared Yates's wharf to be a nuisance and ordered its abatement. *See Yates*, 77 U.S. at 505.  The case eventually reached the Supreme Court, which held that the mere declaration that Yates's wharf is a nuisance does not make it so.  *Yates*, 77 U.S. at 505.  More pertinent to the present discussion are the Supreme Court's statements respecting Yates's entitlement to compensation.  In particular, the Court observed that among "the rights of a riparian proprietor whose land is bounded by a navigable stream" are "access to the navigable part of the river from the front of his lot" and "the right to make a landing, wharf or pier for his own use or for the use of the public."  *Yates*, 77 U.S. at 504.  This "riparian right," the Court observed,

> is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired.  It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and if necessary that it be taken for the public good, upon due compensation.

*Yates*, 77 U.S. at 504.  Thus, the Supreme Court held that if the City creates a dock line which "deprive[s] riparian owners of the right to avail themselves of the advantage of the navigable channel by building wharves and docks to it for that purpose," compensation is required.  *Yates*, 77 U.S. at 505, 507.  Notably, the following year, the Supreme Court reaffirmed "that a serious interruption to the common and necessary use of property may be . . . equivalent to the taking of it, and that under the constitutional provisions it is not

28

necessary that the land should be absolutely taken." *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 179 (1872).

¶146  In sum, 19th century courts recognized what we now think of as "regulatory takings" of property, and the assertion that these are a "modern" phenomenon (Opinion, ¶ 67) is simply wrong.  Indeed, none of the foregoing cases involved "physical invasion or outright appropriation" by the government (Opinion, ¶ 67).

¶147  As an aside, it is interesting that the "bundle-of-sticks" conception of property— i.e., the view that "property" is a bundle of discrete rights associated with a thing, such as the rights of usage, exclusion, alienation, access, and alteration—was frequently seen in the cases of this period.  *See* Kobach, 1996 Utah L. Rev. at 1236, 1252.  Each discrete right was protected to the same degree as the next.  Moreover, in determining whether a state action constituted a compensable taking, courts which adhered to this conception of property, "imposed neither a threshold dollar value for the total injury nor a minimum percentage by which the entire property had to be devalued.  Instead, a much simpler rule seemed to underlie their opinions:  if *any* discrete stick in the bundle was taken, compensation was required."  Kobach, 1996 Utah L. Rev. at 1252.

### 2. The Supreme Court's Substantive Due Process Approach

¶148  As touched on in the discussion of police power/noxious use theory above, the Supreme Court during the last quarter of the 19th century analyzed regulatory takings claims against the States under the Fourteenth Amendment's Due Process Clause.  *See* Bradley C. Karkkainen, *The Police Power Revisited: Phantom Incorporation and the Roots of the Takings "Muddle,"* 90 Minn. L. Rev. 826, 847-50 (2006); *see also* Kobach,

1996 Utah L. Rev. at 1276-85 (explaining that in *Railroad Co. v. Richmond*, 96 U.S. 521 (1878), *Transportation Co. v. Chicago*, 99 U.S. 635 (1879), *Mugler v. Kansas*, 123 U.S. 623, 8 S. Ct. 273 (1887), and *Scranton v. Wheeler*, 179 U.S. 141, 21 S. Ct. 48 (1900), the Supreme Court "retreated" from the takings doctrine it had enunciated in *Yates* and *Pumpelly*). The analysis turned centrally on whether the challenged regulation fell within the legitimate bounds of the state's police power, since that power was viewed as an inherent limitation on state-law property rights. In other words, if the regulation was a legitimate exercise of the police power, no compensation was required for the simple reason that no deprivation of property had occurred. *See* Karkkainen, 90 Minn. L. Rev. at 830-31, 838-42; *see also e.g. Powell v. Pennsylvania*, 127 U.S. 678, 683-87, 8 S. Ct. 992, 995-97 (1888); *Chicago, Burlington & Quincy Railroad Co. v. Chicago* ("*Chicago, B & Q*"), 166 U.S. 226, 252, 17 S. Ct. 581, 590-91 (1897). The Court followed this approach well into the 20th century.[2] *See e.g. Atlantic Coast Line R. Co. v. Goldsboro*,

---

[2] *Chicago, B & Q* has been cited as the case in which the protections of the Fifth Amendment's Takings Clause were made applicable to the States through the Fourteenth Amendment. *See e.g. Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 122, 98 S. Ct. 2646, 2658 (1978); *Dolan v. City of Tigard*, 512 U.S. 374, 383-84, 114 S. Ct. 2309, 2316 (1994). However, *Chicago, B & Q* contains no mention of either the Takings Clause or the Fifth Amendment. Rather, the case was decided on substantive due process grounds. The Supreme Court held that the Fourteenth Amendment's Due Process Clause "requires compensation to be made or adequately secured to the owner of private property taken for public use under the authority of a State." *See Chicago, B & Q*, 166 U.S. at 235-41, 17 S. Ct. at 584-86; *see also Dolan*, 512 U.S. at 405-06, 114 S. Ct. at 2326-27 (Stevens, Blackmun, & Ginsburg, JJ., dissenting). This compensation requirement derived from "universal law" and "natural equity," not the Fifth Amendment. *See Chicago, B & Q*, 166 U.S. at 236, 17 S. Ct. at 584; Karkkainen, 90 Minn. L. Rev. at 829-30. In his article, Professor Karkkainen persuasively demonstrates that it was not until 1978, in *Penn Central*, that the Supreme Court first explicitly held the Takings Clause applicable to the States. *See* Karkkainen, 90 Minn. L. Rev. at 838-78.

232 U.S. 548, 558-59, 34 S. Ct. 364, 368 (1914); *New Orleans Public Service, Inc. v. New Orleans*, 281 U.S. 682, 687, 50 S. Ct. 449, 450 (1930); *Goldblatt v. Hempstead*, 369 U.S. 590, 592, 82 S. Ct. 987, 989 (1962); *but see Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922) ("When this seemingly absolute protection [of private property] is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.").

¶149 The line which separated legitimate from illegitimate exercises of the police power, in turn, hinged on the following: whether the regulation was in some way designed to promote the health, safety, or welfare of the community; whether the means employed had a real and substantial relation to the avowed or ostensible purpose of the regulation; and whether the interference with private rights was not wanton or arbitrary. *See e.g. Mugler*, 123 U.S. at 661, 8 S. Ct. at 297; *Lawton v. Steele*, 152 U.S. 133, 137, 14 S. Ct. 499, 501 (1894); *Dobbins v. Los Angeles*, 195 U.S. 223, 238-39, 25 S. Ct. 18, 21 (1904); *St. Louis, Iron Mt. & S. Ry. Co. v. Wynne*, 224 U.S. 354, 359-60, 32 S. Ct. 493, 494 (1912); *Atlantic Coast Line*, 232 U.S. at 559, 34 S. Ct. at 368; *Reinman v. Little Rock*, 237 U.S. 171, 176-77, 35 S. Ct. 511, 513 (1915); *Hadacheck v. Sebastian*, 239 U.S. 394, 410, 36 S. Ct. 143, 145 (1915); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 395, 47 S. Ct. 114, 118, 121 (1926); *Miller v. Schoene*, 276 U.S. 272, 279-80, 48 S. Ct. 246, 247-48 (1928); *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S. Ct. 447, 448 (1928); *Goldblatt*, 369 U.S. at 594-95, 82 S. Ct. at 990.

### 3. *Penn Central*'s Conflation of Doctrines

¶150 Meanwhile, during this same period, the Fifth Amendment's Takings Clause operated as a parallel and similar, but nonetheless distinct and independent strand of constitutional doctrine, with its own canonical precedents. *See* Karkkainen, 90 Minn. L. Rev. at 855-61 (and cases discussed therein). In *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978), however, the Supreme Court collapsed its substantive due process and takings precedents into a single Fifth Amendment regulatory takings test applicable to both state and federal actions, thereby creating a "muddle." *See* John D. Echeverria & Sharon Dennis, *The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion*, 17 Vt. L. Rev. 695, 695-703 (1993). The Court articulated a number of factors that it considered pertinent under this test, including the economic impact of the regulation on the property owner, the extent to which the regulation has interfered with distinct investment-backed expectations, the character of the governmental action, and whether the regulation has an unduly harsh impact upon the owner's use of the property. *Penn Central*, 438 U.S. at 124, 127, 98 S. Ct. at 2659, 2660-61. In addition, the Court retained the fundamental precepts of substantive due process doctrine. *See Penn Central*, 438 U.S. at 125-27, 98 S. Ct. at 2659-61 (discussing or citing, among others, *Nectow*, *Euclid*, *Miller*, *Hadacheck*, *Reinman*, *Mugler*, and *Goldblatt*). In particular, the Court reaffirmed that "a use restriction on real property may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose." *Penn Central*, 438 U.S. at 127, 98 S. Ct. at 2660. Ultimately, the Court concluded that the regulation at issue (New York City's Landmarks Preservation Law)

had not effected a taking of the appellants' property because "[t]he restrictions imposed are substantially related to the promotion of the general welfare and not only permit reasonable beneficial use of the landmark site but also afford appellants opportunities further to enhance not only the Terminal site proper but also other properties." *Penn Central*, 438 U.S. at 138, 98 S. Ct. at 2666.

¶151   As a conflation of substantive due process and takings doctrines, the *Penn Central* inquiry necessarily reflected elements of both.   Two years later, in *Agins v. City of Tiburon*, 447 U.S. 255, 100 S. Ct. 2138 (1980), the Supreme Court summarized the takings inquiry as follows:   "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests or denies an owner economically viable use of his land." *Agins*, 447 U.S. at 260, 100 S. Ct. at 2141 (citing *Nectow*, 277 U.S. at 188, 48 S. Ct. at 448, and *Penn Central*, 438 U.S. at 138 n. 36, 98 S. Ct. at 2666 n. 36).   The "substantially advances" prong of this test was repeated in numerous subsequent cases, *see Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 704, 119 S. Ct. 1624, 1636 (1999) (citing cases), and remained in place for the next 25 years.

#### 4. *Lingle*'s Clarifications

¶152   In *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S. Ct. 2074 (2005), the Supreme Court jettisoned the "substantially advances" formulation.   The Court observed that the Takings Clause was designed not to limit governmental interference with property rights per se, but rather to secure compensation in the event of *otherwise proper* interference amounting to a taking.   *Lingle*, 544 U.S. at 537, 125 S. Ct. at 2080.   With

respect to regulatory takings, the Court framed the dispositive question as whether the regulation is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537, 125 S. Ct. at 2081. To answer this question, the Court explained, courts must focus on "the severity of the burden that government imposes upon private property rights." *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082.

¶153 The "substantially advances" formula, however, suggests a means-ends test: It asks, in essence, whether a regulation of private property is effective in achieving some legitimate public purpose. *Lingle*, 544 U.S. at 542, 125 S. Ct. at 2083. Of course, this is the due process inquiry the Court had long applied when analyzing regulatory takings claims against the States under the Fourteenth Amendment. In *Lingle*, however, the Court made clear that this sort of inquiry is ineffective for discerning whether private property has been "taken" for purposes of the Fifth Amendment:

> [T]he "substantially advances" inquiry reveals nothing about the *magnitude or character of the burden* a particular regulation imposes upon private property rights. Nor does it provide any information about how any regulatory burden is *distributed* among property owners. In consequence, this test does not help to identify those regulations whose effects are functionally comparable to government appropriation or invasion of private property; it is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regulatory actions to be challenged under the Clause.
>
> . . .
>
> Instead of addressing a challenged regulation's effect on private property, the "substantially advances" inquiry probes the regulation's underlying validity. But such an inquiry is logically prior to and distinct from the question whether a regulation effects a taking, for the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose. The Clause expressly requires compensation where government takes private property *"for public use."* It does not bar government from interfering with property rights, but rather requires

34

compensation "in the event of *otherwise proper interference* amounting to a taking." Conversely, if a government action is found to be impermissible— for instance because it fails to meet the "public use" requirement or is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.

*Lingle*, 544 U.S. at 542-43, 125 S. Ct. at 2084 (citation omitted).

¶154 *Lingle*, therefore, is an important clarification of federal regulatory takings law. The critical focus in a regulatory takings case is on the severity of the burden a particular regulation imposes on private property rights and how that regulatory burden is distributed among property owners. The due process and means-ends considerations that had informed the Court's prior decisions are no longer appropriate measures of whether a taking has occurred.

¶155 It is also important to note here that in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992), the Supreme Court explicitly rejected the notion that a valid police power regulation never requires compensation to the owner. The Court observed that there are "limits to the noncompensable exercise of the police power." *Lucas*, 505 U.S. at 1026, 112 S. Ct. at 2899. Otherwise, if "the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].' " *Lucas*, 505 U.S. at 1014, 112 S. Ct. at 2892-93 (brackets in *Lucas*) (quoting *Mahon*, 260 U.S. at 415, 43 S. Ct. at 160).

### 5. Conclusion

¶156 The due process considerations pervading the District Court's decision and the Sportsmen's and the State's respective arguments may be understood in light of the many

Supreme Court precedents which analyze regulatory takings claims using due process principles. However, such considerations are misplaced in light of *Lingle*. The Ranchers are not precluded from recovering for a constitutional taking simply because the State was exercising its police powers, or because I-143 substantially advances legitimate state interests. Indeed, we assume going into the takings analysis that the governmental actions embodied in I-143 are valid, and the central question we address is whether I-143 is "so onerous that its effect is tantamount to a direct appropriation or ouster." *See Lingle*, 544 U.S. at 537, 543, 125 S. Ct. at 2081, 2084.

### III. ANALYSIS OF THE RANCHERS' TAKINGS CLAIMS

#### A. The Basis of the Ranchers' Claims

¶157 The Ranchers filed this action against the State, and the Sportsmen intervened as defendants a month later. The Ranchers challenged I-143 on various grounds, including due process and equal protection, and they sought declaratory and injunctive relief. In the alternative, if I-143 were found to be constitutional and enforceable against them, the Ranchers sought just compensation for a regulatory taking of their property. The Ranchers, in other words, brought an "inverse condemnation" action.

¶158 The phrase "inverse condemnation" is a shorthand description of the manner in which a property owner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. *United States v. Clarke*, 445 U.S. 253, 257, 100 S. Ct. 1127, 1130 (1980). Whereas a condemnation proceeding typically involves an action by the condemnor to acquire title to property, inverse condemnation is an action by the property owner against a governmental defendant to recover the value of

36

property that has been taken, even though no formal exercise of the power of eminent domain has been attempted by the government. *See Clarke*, 445 U.S. at 257, 100 S. Ct. at 1130; *see also First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 316, 107 S. Ct. 2378, 2386 (1987) ("While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings."). Thus, "inverse condemnation" describes an action that is the "inverse" or "reverse" of a condemnation proceeding. *Clarke*, 445 U.S. at 257, 100 S. Ct. at 1130. "The owner's right to bring such a suit derives from the self-executing character of the constitutional provision with respect to condemnation." *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 5 n. 6, 104 S. Ct. 2187, 2191 n. 6 (1984) (internal quotation marks omitted).

¶159 Here, the State did not condemn the Ranchers' property through a formal proceeding; rather, the State regulated their property through passage of I-143. As a result, the Ranchers brought an inverse condemnation action to recover for their losses caused by the Initiative. *See Southview Assoc. v. Bongartz*, 980 F.2d 84, 93 n. 3 (2d Cir. 1992) ("Essentially, a regulatory taking—also known as inverse condemnation—occurs when the purpose of government regulation and its economic effect on the property owner render the regulation substantively equivalent to an eminent domain proceeding and, therefore, require the government to pay compensation to the property owner."); Julius L. Sackman, *Nichols on Eminent Domain* vol. 2A, § 6.03[1], 6-182 (3d ed., Matthew Bender 2006) ("[S]ome regulatory or other activities may effect a taking,

necessitating that owners bring inverse condemnation proceedings against the government.").

## B. The Constitutional Basis for Our Decision

¶160 The Ranchers seek relief under the Fifth Amendment to the United States Constitution and Article II, Section 29 of the Montana Constitution. Yet, while the Court's decision purports to rest on both of these provisions, *see* Opinion, ¶¶ 29, 54, 63, 65, and while the Court acknowledges that the plain language of the two provisions differs, Opinion, ¶ 30—indeed, the language of Article II, Section 29 is facially broader than the language of the Fifth Amendment—the Court nevertheless offers no independent interpretation of Article II, Section 29. Quite to the contrary, the Court decides to follow "our previous approach of looking towards federal jurisprudence when considering takings claims under Montana law." Opinion, ¶ 31. In so doing, the Court equates the Ranchers' claims under the Fifth Amendment with the Ranchers' claims under Article II, Section 29.

¶161 The Court offers a singularly unpersuasive explanation for this approach: "[The Ranchers] rely almost exclusively on federal case law." Opinion, ¶ 31. That, however, is hardly a justification for treating a claim brought under a facially broader provision of the Montana Constitution as no different from a claim brought under the provision's counterpart in the United States Constitution. Moreover, if it seems that the Ranchers are relying "almost exclusively" on federal caselaw, it is because there is very little, if any, Montana caselaw on point. And this jurisprudential void is not likely to be filled when this Court persists in the utterly circular and self-perpetuating syllogism: because this

38

Court in the past has looked to federal caselaw for guidance when considering takings claims, the Ranchers have relied on federal caselaw in support of their position, and because the Ranchers have relied on federal caselaw in support of their position, we will look to federal caselaw in considering their takings claims.

¶162 Of course, "[i]t is perfectly proper for us to use criteria developed in federal cases" when state law is silent or lacking. *Pfost v. State*, 219 Mont. 206, 216, 713 P.2d 495, 501 (1985), *overruled on other grounds*, *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 26, 776 P.2d 488, 491 (1989). It is also proper for us to rely on federal jurisprudence as persuasive authority. But there is a vast difference between looking to federal law for guidance and allowing federal-court decisions to dictate the meaning and substance of Montana's Constitution. Unfortunately, in the case at hand, the Court has done the latter by conflating the Ranchers' federal and state constitutional claims into one.

¶163 It would be one thing if the Court simply refused to reach the Ranchers' claims under Article II, Section 29 on the ground that they had failed to raise it adequately. *See e.g. State v. Garrymore*, 2006 MT 245, ¶¶ 38-39, 334 Mont. 1, ¶¶ 38-39, 145 P.3d 946, ¶¶ 38-39 (concluding that Garrymore's argument under Article II, Sections 24 and 26 was "too undeveloped to undertake a distinctive application of state constitutional principles"); *State v. Rosling*, 2008 MT 62, ¶ 66, 342 Mont. 1, ¶ 66, 180 P.3d 1102, ¶ 66 (same). But that is not what the Court does. Rather, notwithstanding the Ranchers' reliance "almost exclusively" on federal caselaw and the Ranchers' corresponding failure to develop their theory of relief under the Montana Constitution to the Court's satisfaction—the exact situation we faced in *Garrymore* and *Rosling*—the Court proceeds

39

to issue a decision that likewise relies almost exclusively on Fifth Amendment cases but is grounded, in part, on Article II, Section 29. This equating of the two constitutional provisions is regrettable, not only because it denigrates our own Constitution and renders Article II, Section 29 little more than a constitutional redundancy, but also because it is totally unnecessary. If the Ranchers are to be faulted for failing to cite precedents under Article II, Section 29 to the Court's satisfaction, then their claims should be resolved under M. R. App. P. 12(1)f., not by conflating their federal and state constitutional claims into one.

¶164 According to the State, the Ranchers "conceded in the court below that the reach of the Taking Clause under the Fifth Amendment and the protection from uncompensated takings found in Article II, Section 29 of the Montana Constitution are co-extensive." As support for this assertion, the State directs us to the following statement by the Ranchers in one of their District Court filings: "The Montana Supreme Court is generally in accord with federal case law on the analysis of takings." (The Court refers to this statement as well. *See* Opinion, ¶ 31.) This, however, is hardly the concession the State makes it out to be. The Ranchers did not "concede" that the protections of the Fifth Amendment and Article II, Section 29 are "co-extensive." They merely offered a candid acknowledgement of this Court's past approach, which is to "look[ ] towards federal jurisprudence when considering takings claims under Montana law" (Opinion, ¶ 31). More importantly, this supposed concession that the protections of the Fifth Amendment and Article II, Section 29 are "co-extensive" does not establish that they are so. This Court, not the Ranchers, determines the "reach" of Article II, Section 29.

¶165 We have recognized that the provisions of Article II are "separate and enforceable constitutional rights insofar as the jurisdiction of the State of Montana extends." *Madison v. Yunker*, 180 Mont. 54, 60, 589 P.2d 126, 129 (1978). We have also said that "we will not reach a federal constitutional challenge unless and until the case may not be resolved on adequate and independent state grounds." *Buckman v. Montana Deaconess Hosp.*, 224 Mont. 318, 325, 730 P.2d 380, 384 (1986). Along these same lines, we have stated that where the constitutionality of a governmental act affecting property rights is attacked under both the United States Constitution and the Montana Constitution, "we believe it to be our duty, irrespective of the holdings of other courts, to consider and apply the provisions of our own Constitution and general statutes thereto, and declare the rule of property for Montana." *Gas Products Co. v. Rankin*, 63 Mont. 372, 388, 207 P. 993, 997-98 (1922). Finally, when interpreting provisions of Article II, we have long refused to march lockstep with the United States Supreme Court's pronouncements concerning similar provisions of the federal constitution.[3]

¶166 For these reasons, our approach in this case should be to address the Ranchers' claims first under the Montana Constitution and then, if necessary, under the United

___

[3] *See e.g. Walker v. State*, 2003 MT 134, ¶ 73, 316 Mont. 103, ¶ 73, 68 P.3d 872, ¶ 73 (holding that Article II, Sections 4 and 22 provide greater protection than the Eighth Amendment); *State v. Guillaume*, 1999 MT 29, ¶ 16, 293 Mont. 224, ¶ 16, 975 P.2d 312, ¶ 16 (holding that Article II, Section 25 provides greater protection than the Fifth Amendment); *Woirhaye v. District Court*, 1998 MT 320, ¶¶ 6-26, 292 Mont. 185, ¶¶ 6-26, 972 P.2d 800, ¶¶ 6-26 (concluding that Article II, Sections 24 and 26 provide greater protection than the Sixth Amendment); *Gryczan v. State*, 283 Mont. 433, 447-51, 942 P.2d 112, 120-23 (1997) (concluding that Article II, Section 10, provides greater protection than the federal constitution's right to privacy); *Vernon Kills On Top v. State*, 279 Mont. 384, 420-24, 928 P.2d 182, 204-07 (1996) (concluding that Article II, Section 22 provides greater protection than the Eighth Amendment).

States Constitution. The Court's decision, however, is based entirely on Fifth Amendment jurisprudence. Moreover, although the Ranchers cite Article II, Section 29 as a basis for relief, their corresponding argument is largely undeveloped. *Cf. Garrymore*, ¶¶ 38-39; *Rosling*, ¶ 66. Accordingly, I will analyze the Ranchers' claims under the Fifth Amendment, rather than Article II, Section 29. In so doing, I will also explain my disagreement with the Court's corresponding Fifth Amendment analysis. As for Article II, Section 29, the claim that I-143 effected a taking or damaging of property under the Montana Constitution is better developed by the appellants in the companion case, *Buhmann v. State* (No. 05-473). Therefore, I will address Article II, Section 29 within the context of that case and explain why that provision entitles the *Buhmann* appellants to just compensation.

## C. Analytical Framework and Relevant Principles under the Fifth Amendment

¶167 The Fifth Amendment states: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In analyzing a takings claim in the context of an inverse condemnation action, the court first determines whether the plaintiff possesses a constitutionally protected property interest. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000, 104 S. Ct. 2862, 2871 (1984); *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008). Whether one has a protected property interest is a question of law. *See Texas State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005). If the plaintiff possesses a protected property interest, the court then determines whether a part or a whole of that interest has been taken for public use, thus entitling the plaintiff to just compensation. *Monsanto*, 467 U.S. at 1000-01, 104 S. Ct. at 2871;

42

*Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005). The issue of whether a taking has occurred is a question of law based on factual underpinnings. *Huntleigh*, 525 F.3d at 1377.

¶168    With respect to the first question (whether the plaintiff possesses a constitutionally protected property interest), the Constitution protects, but does not create, property interests. *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164, 118 S. Ct. 1925, 1930 (1998). Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Monsanto*, 467 U.S. at 1001, 104 S. Ct. at 2872 (internal quotation marks omitted); *accord Phillips*, 524 U.S. at 164, 118 S. Ct. at 1930. In this regard, the term "property," as used in the Takings Clause, is not restricted to any particular type of property. To the contrary, it encompasses a wide variety of interests. Clearly, it includes real property, personal property, and intangible property. *Huntleigh*, 525 F.3d at 1377-78. But it also " 'denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.' " *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 82 n. 6, 100 S. Ct. 2035, 2041 n. 6 (1980) (brackets in *PruneYard*) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S. Ct. 357, 359 (1945)). Property interests "are about as diverse as the human mind can conceive," *Florida Rock Industries v. United States*, 18 F.3d 1560, 1572 n. 32 (Fed. Cir. 1994), and the Takings Clause is addressed to "every sort of interest the citizen may possess," *General Motors*, 323 U.S. at 378, 65 S. Ct. at 359.

¶169   With respect to the second question (whether a part or a whole of the plaintiff's property interest has been taken for public use), the Supreme Court's precedents stake out two categories of regulatory action that generally will be deemed per se takings for Fifth Amendment purposes:   first, where the government requires an owner to suffer a permanent physical invasion of her property, and second, where a regulation completely deprives an owner of all economically beneficial uses of her property.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538, 125 S. Ct. 2074, 2081 (2005) (citing, respectively, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164 (1982), and *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886 (1992)).  Outside these two relatively narrow categories (and the special context of land-use exactions, which are not at issue here), regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978).  *See Lingle*, 544 U.S. at 538, 125 S. Ct. at 2081.

¶170   The case at hand does not involve a *Loretto*-type "permanent physical invasion" claim, but the Ranchers do make several assertions that could be construed as a *Lucas*-type "total regulatory taking" claim.  For instance, the Kafkas assert that after I-143, there was "no economically viable use" of their alternative livestock and that the fair market value of their licenses and businesses "went to zero."  Likewise, citing *Lucas*, the Bridgewaters and the Boumas assert that passage of I-143 "destroyed the beneficial use" of their property and "effectively left it economically idle."  The Court also perceives a *Lucas*-based theory in the Ranchers' arguments, noting that "Appellants urge us to . . . correctly apply the *Penn Central* or *Lucas* takings analysis."  Opinion, ¶ 36.

44

¶171  At the same time, however, the Kafkas make the dubious pronouncement that "*Lucas* analysis applies to categorical takings of land, not regulatory takings of other property interests."  In an unexpected twist, the State counters that "[w]hile *Lucas* on its facts involved a claimed categorical taking of land, the principles explained by the court in its opinion govern in other regulatory taking contexts as well, as exemplified by [*American Pelagic Fishing Co. v. United States*, 379 F.3d 1363 (Fed. Cir. 2004)]."  Yet, according to the Kafkas, application of *Lucas* to their regulatory takings claim would be "misguided and erroneous."  They contend that "whether the regulation at issue has denied the claimant of the economically viable use of its property" is to be examined under the economic-impact prong of the *Penn Central* test.  The Bridgewaters and the Boumas do not go so far as to reject a *Lucas*-based theory outright, but they, like the Kafkas, tie their *Lucas* arguments to their *Penn Central* analysis.  Accordingly, given the lack of a distinct *Lucas*-based analysis in the Ranchers' briefs, and given that their Fifth Amendment arguments track the analytical approach set forth in *Penn Central*, I likewise will address their regulatory takings challenge under *Penn Central*'s standards.

¶172  Two fundamental principles underlie the Supreme Court's regulatory takings jurisprudence.  The first is Justice Holmes' proposition that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922).  The second is Justice Black's articulation of the purpose of the Takings Clause: "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to

45

bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960). These two principles are cited time and again in the Supreme Court's contemporary takings cases.[4]

¶173 The Supreme Court has been "unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659; *accord Lingle*, 544 U.S. at 538, 125 S. Ct. at 2081. Indeed, except for the two per se categories identified above (permanent physical invasion, and complete deprivation of all economically beneficial use), the Court has " 'generally eschewed' any set formula for determining how far is too far, choosing instead to engage in ' "essentially ad hoc, factual inquiries." ' " *Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency*, 535 U.S. 302, 326, 122

---

[4] *See e.g. Penn Central*, 438 U.S. at 123, 98 S. Ct. at 2659; *PruneYard*, 447 U.S. at 82-83, 100 S. Ct. at 2041-42; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 163, 101 S. Ct. 446, 452 (1980); *Williamson County Regional Planning Com'n v. Hamilton Bank*, 473 U.S. 172, 197-98, 105 S. Ct. 3108, 3122 (1985); *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227, 106 S. Ct. 1018, 1027 (1986); *Hodel v. Irving*, 481 U.S. 704, 718, 107 S. Ct. 2076, 2084 (1987); *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 316, 318-19, 107 S. Ct. 2378, 2386, 2388 (1987); *Bowen v. Gilliard*, 483 U.S. 587, 608, 107 S. Ct. 3008, 3021 (1987); *Nollan v. California Coastal Com'n*, 483 U.S. 825, 835 n. 4, 107 S. Ct. 3141, 3148 n. 4 (1987); *Pennell v. San Jose*, 485 U.S. 1, 9, 108 S. Ct. 849, 856 (1988); *Yee v. Escondido*, 503 U.S. 519, 529, 112 S. Ct. 1522, 1529 (1992); *Lucas*, 505 U.S. at 1014-15, 112 S. Ct. at 2893; *Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S. Ct. 2309, 2316 (1994); *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 734, 117 S. Ct. 1659, 1665 (1997); *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702, 119 S. Ct. 1624, 1635 (1999); *Palazzolo v. Rhode Island*, 533 U.S. 606, 617-18, 121 S. Ct. 2448, 2457-58 (2001); *Lingle*, 544 U.S. at 537, 125 S. Ct. at 2080, 2081.

S. Ct. 1465, 1481 (2002) (quoting *Lucas*, 505 U.S. at 1015, 112 S. Ct. at 2893, in turn quoting *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659).

¶174    Nevertheless, in *Penn Central*, the Supreme Court identified "several factors that have particular significance" in conducting these "ad hoc, factual inquiries." *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659. The factors include "[t]he economic impact of the regulation on the claimant," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action." *Penn Central*, 438 U.S. at 124, 98 S. Ct. at 2659. The Supreme Court reaffirmed the *Penn Central* test in *Lingle*.[5] *See Lingle*, 544 U.S. at 538-39, 548, 125 S. Ct. at 2081-82, 2087.

¶175    In applying these factors, we must remain cognizant of the object of this exercise. Thus, it is useful to reiterate some of the clarifications made by the Supreme Court in *Lingle* and discussed in Part II-D-4 of this Dissent. In particular, the ultimate question in a Fifth Amendment regulatory takings analysis is whether the regulation is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537, 125 S. Ct. at 2081. To answer this question, each of the Supreme Court's regulatory takings tests "focuses directly upon the severity of the burden that government imposes upon private property rights." *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082; *see also*

---

[5] Incidentally, it is puzzling that the *Lingle* Court, on one hand, unequivocally rejected the due process inquiry articulated in *Agins* but, on the other hand, reaffirmed *Penn Central*'s takings test, which itself is steeped in due process doctrine (*see Penn Central*, 438 U.S. at 125-27, 138, 98 S. Ct. at 2659-61, 2666). It is marginally reassuring that in explaining the *Penn Central* test, the *Lingle* Court emphasized the economic impact of the regulation on the plaintiff as one of the "[p]rimary" factors of the test. *See Lingle*, 544 U.S. at 538-39, 125 S. Ct. at 2081-82.

*Lingle*, 544 U.S. at 542, 125 S. Ct. at 2084 (emphasizing "the *magnitude or character of the burden* a particular regulation imposes upon private property rights"). For example, a permanent physical invasion, however minimal the economic cost it entails, must be compensated because it "eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests." *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082. In the *Lucas* context, compensation is required for the complete elimination of a property's value because " 'total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation.' " *Lingle*, 544 U.S. at 539-40, 125 S. Ct. at 2082 (quoting *Lucas*, 505 U.S. at 1017, 112 S. Ct. at 2894). And the *Penn Central* inquiry "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540, 125 S. Ct. at 2082.

¶176 With this framework in mind, I proceed with a Fifth Amendment analysis of the Ranchers' takings claims.

### D. Analysis of the Ranchers' Claims under the Fifth Amendment

¶177 The Court divides the Ranchers' assets into four categories: alternative livestock ranch licenses, intangible business assets, real estate interests and fixtures, and alternative livestock. The Court explains that "[i]n cases where there is a 'mix' of property interests, it is appropriate, if warranted under the circumstances, to consider those interests separately in a takings analysis." Opinion, ¶ 37. Apparently, separate consideration of property interests is "warranted" in this case because "[t]hat was the approach applied by the District Court." Opinion, ¶ 37. I question whether this is a legally authoritative

48

rationale for the Court's approach. But, for the sake of argument, and because it facilitates a comparison between the Court's reasoning and my own, I will consider each of the Ranchers' assets under the categories proffered by the Court.

### 1. The Alternative Livestock Ranch Licenses

¶178 At the outset of discussing the Ranchers' alternative livestock ranch licenses, it must be pointed out that the Court's discussion at ¶¶ 38-54 is largely off point. These paragraphs are dedicated to the question of whether a "government-issued license" is a compensable property interest. The Court ultimately answers this question in the negative, at least as far as the Ranchers' licenses are concerned. Opinion, ¶ 54. Yet, I-143 did not revoke the Ranchers' licenses. Indeed, the Ranchers still possess and use their licenses, and they may continue to do so, so long as they pay the annual renewal fee, comply with all recording and reporting requirements, and do not engage in misconduct in operating their ranches. Sections 87-4-412(1), -423(1), -427(1), MCA (2001).

¶179 Thus, since the Ranchers still have their licenses, they obviously are not claiming that I-143 took the licenses themselves. What the Ranchers claim, rather, is that I-143 took a particular property interest associated with the licenses—namely, the right to transfer them and, more generally, their businesses. *See* Laws of Montana 2001, 2000 Ballot Issues, Initiative No. 143, § 4 (amending § 87-4-412(2), MCA); § 87-4-412(2), MCA (2001) ("An alternative livestock ranch license for a specific facility is not transferable."). There can be no doubt that the right to transfer is a compensable property interest. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 500, 107 S. Ct. 1232, 1250 (1987) ("[T]he right to sell property [is] . . . one element of the owner's

49

property interest."); *Andrus v. Allard*, 444 U.S. 51, 65-66, 100 S. Ct. 318, 327 (1979) (labeling the right to dispose of property—e.g., through commercial transactions—as "one traditional property right" and one "strand" of the "bundle" of property rights an owner possesses); *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002) ("The rights to sell, assign, or otherwise transfer are traditional hallmarks of property."); *Thompson v. Lincoln Nat. Life Ins. Co.*, 114 Mont. 521, 533, 138 P.2d 951, 957 (1943) ("[A]n essential element of the right of private property is the right to use or dispose of it . . . ."); § 70-1-503, MCA ("Property of any kind may be transferred, . . . .").

¶180 I-143 abrogated the Ranchers' ability to sell, assign, or otherwise transfer their businesses by amending § 87-4-412(2), MCA, to prohibit the transfer of their alternative livestock ranch licenses. Accordingly, the actual question here is whether this revocation of the right to transfer constitutes a taking under the *Penn Central* inquiry—an issue the Court conveniently sidesteps by rewriting the Ranchers' claim to be one based on loss of the licenses themselves, rather than loss of the right to transfer the licenses.

¶181 In answering this question, the Supreme Court's decision in *Hodel v. Irving*, 481 U.S. 704, 107 S. Ct. 2076 (1987), provides useful guidance. At issue in *Irving* was a regulation requiring certain undivided fractional interests in Indian lands to escheat to the tribe. In conducting its *Penn Central* inquiry, the Supreme Court first concluded that the economic impact of this regulation "can be substantial," given the value of the underlying lands. *Irving*, 481 U.S. at 714, 107 S. Ct. at 2082. Furthermore, the Court observed that "the right to pass on valuable property to one's heirs is itself a valuable right." *Irving*, 481 U.S. at 715, 107 S. Ct. at 2082-83. Thus, even though the owners of the escheatable

50

interests had full beneficial use of their property during their lifetimes, they had lost a valuable right associated with those interests. On the other hand, while some of the owners may have purchased their interests with the expectation that they might pass on the remainder to their heirs at death, most of them had acquired their interests by gift, descent, or devise. Thus, the extent to which they had investment-backed expectations in passing on the property was "dubious." *Irving*, 481 U.S. at 715, 107 S. Ct. at 2083. Also weighing "weakly" in favor of the statute was the "average reciprocity of advantage"— i.e., the fact that consolidation of Indian lands in the tribe benefitted the members of the tribe. *Irving*, 481 U.S. at 715-16, 107 S. Ct. at 2083 (internal quotation marks omitted).

¶182 At this point, the Supreme Court noted that if it were to stop its analysis based on the foregoing considerations, "we might well find [the regulation] constitutional. But the character of the Government regulation here is extraordinary." *Irving*, 481 U.S. at 716, 107 S. Ct. at 2083. With reasoning that is pertinent to the Ranchers' loss of transferability, the Court explained:

> In *Kaiser Aetna v. United States*, [444 U.S. 164, 176, 100 S. Ct. 383, 391 (1979)], we emphasized that the regulation destroyed "one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others." Similarly, the regulation here amounts to virtually the abrogation of the right to pass on a certain type of property—the small undivided interest—to one's heirs. In one form or another, the right to pass on property—to one's family in particular—has been part of the Anglo-American legal system since feudal times. . . . Even the United States concedes that total abrogation of the right to pass property is unprecedented and likely unconstitutional. . . . Since the escheatable interests are not, as the United States argues, necessarily *de minimis*, nor, as it also argues, does the availability of *inter vivos* transfer obviate the need for descent and devise, a *total* abrogation of these rights cannot be upheld.

*Irving*, 481 U.S. at 716-17, 107 S. Ct. at 2083-84.

51

¶183  Thus, the Supreme Court held that the escheat regulation " 'goes too far.' " *Irving*, 481 U.S. at 718, 107 S. Ct. at 2084 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922)).  The Court acknowledged the government's "broad authority to adjust the rules governing the descent and devise of property without implicating the guarantees of the Just Compensation Clause."  *Irving*, 481 U.S. at 717, 107 S. Ct. at 2084.  "The difference in this case," the Court explained, "is the fact that both descent and devise are completely abolished."  *Irving*, 481 U.S. at 717, 107 S. Ct. at 2084.

¶184  Similarly, in the case at hand, the character of the government regulation is extraordinary.  I-143 abolished one of the traditional hallmarks of property:  the right to transfer.  The economic impact of this total abrogation is substantial, given that an alternative livestock ranch license is an integral component of an alternative livestock business.  No longer may the Ranchers sell, assign, or otherwise transfer their businesses.  In this connection, the Bridgewaters point out that prior to the passage of I-143, they received an offer of $4 million to buy their operation.  Following passage, however, the offer was withdrawn, in large part because the license could not be transferred.  Under *Irving*, these factors alone dictate that the Ranchers' right to transfer has been taken.

¶185  Notably, the State might have precluded this issue from arising had it continued to prohibit the transfer of alternative livestock ranch licenses.  In that scenario, a participant in the industry would have been hard-pressed to claim an investment-backed expectation in being able to transfer her license and business.  But in 1993, the Legislature granted the right to transfer the licenses.  *See* Laws of Montana 1993, ch. 315, § 6 (substituting

52

"[a] game farm license for a specific facility is transferable" for "[a] game farm license is nontransferable" in § 87-4-412, MCA, effective April 12, 1993). The Bridgewaters entered into the alternative livestock business in 1992 and thereafter invested in improvements uniquely designed for operating an alternative livestock business on their property. The Kafkas and the Boumas began investing in their respective operations in 1996. All of the Ranchers had reasonable expectations that they would be able to sell, assign, or otherwise transfer their businesses. These investment-backed expectations bolster the conclusion that the Ranchers have suffered a taking.

¶186 Before concluding this discussion, I pause to address several facets of the Court's approach. Although I consider the Court's analysis at ¶¶ 38-54 to be largely off point, I believe there are fundamental flaws in that analysis and that it is important to point those out, given the deleterious impact they will have on future takings cases.

¶187 As noted, the Court addresses the question of whether the alternative livestock ranch licenses themselves are compensable property interests. The Supreme Court has said that for purposes of the Fifth Amendment, "[property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S. Ct. 2862, 2872 (1984) (internal quotation marks omitted). Thus, in *Monsanto*, the Supreme Court looked to Missouri law to determine whether Monsanto's trade secrets constituted "property." *See Monsanto*, 467 U.S. at 1001-04, 104 S. Ct. at 2872-73. In so doing, the Supreme Court stated that "intangible property rights protected by state law are deserving of the protection of the Taking Clause." *Monsanto*, 467 U.S. at 1003, 104 S. Ct. at 2873.

Ultimately, the Supreme Court held that "to the extent that Monsanto has an interest in its health, safety, and environmental data cognizable as a trade-secret property right under Missouri law, that property right is protected by the Taking Clause of the Fifth Amendment." *Monsanto*, 467 U.S. at 1003-04, 104 S. Ct. at 2873.

¶188 In light of this approach, one would expect the Court, in the case at hand, to look to Montana law to determine whether the Ranchers' licenses constitute "property." But that is not what the Court does. Rather, the Court allows the United States Court of Appeals for the Federal Circuit to dictate whether a license granted by the State of Montana is protected "property." *See* Opinion, ¶ 46 ("As stated in [*Members of Peanut Quota Holders Ass'n v. United States*, 421 F.3d 1323 (Fed. Cir. 2005)], to qualify as compensable property interests, the Licenses must be transferable, exclusive, and free of any 'express statutory language precluding the formation of a property right . . . .' *Members*, 421 F.3d at 1331. We address each of these requirements in turn, as they apply to the Licenses before us." (ellipsis in original)); Opinion, ¶ 54 ("Accordingly, because the Licenses did not meet the three required criteria for compensability under Members, we conclude the District Court did not err when it held the Licenses were not compensable property interests under the Fifth Amendment of the U.S. Constitution, or Article II, Section 29 of the Montana Constitution."). I do not dispute the validity of the Federal Circuit's test vis-à-vis federally created property interests. Indeed, all of the cases from which the Federal Circuit synthesized its test involved licenses or permits granted by the federal government. *See Members*, 421 F.3d at 1330-31. But why should the Federal Circuit's test define what constitutes a compensable property interest under

54

Montana law?  The Court offers no explanation, and I can conceive of no valid reason—particularly when Montana law does provide the answer.

¶189  As explained in Part II-A of this Dissent, the "existing rules or understandings" related to the Ranchers' licenses, prior to I-143, were as follows.  First, as the State acknowledged during oral argument, "it was the policy of the political branches of government to encourage people to look at game farming as an alternative to traditional agriculture -- actually, to subsidize traditional agriculture so they could stay on the farms and ranches."  *See* § 87-4-431, MCA (1999) ("The legislature recognizes that the production of alternative livestock provides a viable economic opportunity for any private property owner as well as the traditional livestock producers who are interested in diversifying their ranch productivity.").  The licenses were issued and annually renewed in facilitation of this "viable economic opportunity."  Second, renewal of the licenses was a matter of right, upon payment of the renewal fee and compliance with all recording and reporting requirements.  Section 87-4-412(1), MCA.  Third, the license could not be revoked except if the licensee had violated the law or otherwise engaged in misconduct related to the operation of the alternative livestock ranch.  Sections 87-4-423(1), -427(1), MCA.  Fourth, the license was transferable.  Section 87-4-412(2), MCA.

¶190  Given these rules and understandings, it is clear that the Ranchers' licenses had several traditional hallmarks of property, including "the right to possess, use and dispose of [them]."  *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 82 n. 6, 100 S. Ct. 2035, 2041 n. 6 (1980) (internal quotation marks omitted).  The Ranchers could—and did—use their licenses in the furtherance of their businesses.  The Ranchers could sell, assign, or

otherwise transfer their licenses. The Ranchers had statutorily guaranteed security in the continued possession of their licenses and, correspondingly, their ability to pursue this "viable economic opportunity." It seems patently obvious to me that in their alternative livestock ranch licenses, the Ranchers had property rights which were protected by Montana law and, as such, are deserving of protection under the Takings Clause. *Monsanto*, 467 U.S. at 1003-04, 104 S. Ct. at 2873.

¶191 Additional "background principles" of Montana property law further support the conclusion that the Ranchers' licenses are "property" for Takings Clause purposes. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1030, 112 S. Ct. 2886, 2901 (1992). For one thing, the Montana Code contains a provision actually categorizing "licenses" as "property." *See* § 15-6-218(2)(a), MCA. Notably, of the other items of "property" set forth in § 15-6-218(2)(a), MCA (certificates of stock, bonds, promissory notes, copyrights, patents, trademarks, contracts, software, and franchises), several have already been recognized as "property" within the meaning of the Takings Clause. *See Boyle v. United States*, 200 F.3d 1369, 1374 (Fed. Cir. 2000) (copyrights); *Roth v. Pritikin*, 710 F.2d 934, 939 (2d Cir. 1983) (same); *Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) (patents); *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003) (contracts); *Lynch v. United States*, 292 U.S. 571, 579, 54 S. Ct. 840, 843 (1934) (same); *City of Oakland v. Oakland Raiders*, 646 P.2d 835, 839-40 (Cal. 1982) (patents, franchises, and contracts).

¶192 Our decision in *Seven Up Pete Venture v. State*, 2005 MT 146, 327 Mont. 306, 114 P.3d 1009, is also informative here. We held in *Seven Up Pete* that the enactment of

56

I-137 did not constitute an unconstitutional taking since the Venture had not acquired an operating permit to mine using cyanide prior to I-137's enactment and since the State retained substantial contractual and regulatory discretion regarding the issuance of such a permit. *See Seven Up Pete*, ¶¶ 32-33. Of particular relevance, we reasoned:

> [T]he passage of I-137 did not take away any *existing* permits or halt any *on-going* mine operations related to the Venture's projects. Because the Venture had not obtained the requisite operating permit, it likewise had not obtained a right to mine. Moreover, it was not assured of ever obtaining such a right. Therefore, we conclude that the enactment of I-137 did not constitute an unconstitutional taking.

*Seven Up Pete*, ¶ 33 (emphases added). It follows logically from this reasoning that under Montana law, the issuance of a permit or license is a significant act upon which a taking may be premised. Indeed, we dismissed the Venture's takings claim because it did not have an "existing" permit and because I-137 did not halt any "on-going" mine operations. In contrast, the Ranchers did have "existing" licenses; annual renewal of the licenses was a matter of right; and I-143 did halt "on-going" alternative livestock ranching operations—all of which indicates that the Ranchers had compensable property interests in their licenses.

¶193 To all of this, I would simply note that, contrary to the Court's recitation of the law in this area, courts have found government-issued licenses to be compensable property interests. *See e.g. Redevelopment Authority of Philadelphia v. Lieberman*, 336 A.2d 249 (Pa. 1975); *State v. Saugen*, 169 N.W.2d 37 (Minn. 1969). Notably, in *Stallinger v. Goss*, 121 Mont. 437, 193 P.2d 810 (1948), this Court observed: "Section 6672 of the Revised Codes of Montana 1935, defines personal property: 'Every kind of

property that is not real is personal.'  A retail liquor license is saleable and is personal property of value and subject to attachment." *Stallinger*, 121 Mont. at 438, 193 P.2d at 810.  It would be a peculiar proposition to hold that a government-issued license is "personal property of value" for purposes of sale and attachment, but that it loses this quality for purposes of governmental appropriation.

¶194  The Court concedes that the Ranchers' licenses were transferrable.  Opinion, ¶ 47.  The Court also concedes that neither Title 87, chapter 4, part 4, MCA, nor the licenses themselves contained any express language precluding the formation of a compensable property interest.  Opinion, ¶ 48.  Instead, the Court points out that a licensee was required to comply with applicable laws and regulations and that the State retained the power to amend the regulations or to revoke the license if the alternative livestock ranch was being operated in violation of the law.  Opinion, ¶¶ 49-50.  The Court also points out that at common law, wild animals were not subject to private ownership " 'except in so far as the state may choose to make them so.' "  Opinion, ¶ 50 (quoting *Rosenfeld v. Jakways*, 67 Mont. 558, 562, 216 P. 776, 777 (1923)).  These points, however, miss the mark.  Indeed, as the Court itself acknowledges in the very next breath, the government does not have the right (absent just compensation) to withdraw benefits it has conveyed or to qualify those benefits as it chooses when "the statute itself or surrounding circumstances" indicate that the conveyances were "intended to be irrevocable."  Opinion, ¶ 50 (internal quotation marks omitted).  Here, at the risk of belaboring the point, the statutory scheme clearly provided that a license to "acquire, breed, grow, keep, pursue, handle, harvest, use, sell, or dispose of the alternative livestock and their progeny

in any quantity and at any time of year" was intended to be irrevocable, except if the licensee engaged in misconduct. Sections 87-4-412(1), -414(2), -423(1), -427(1), MCA (1999). There is neither evidence nor argument in this case that the Ranchers engaged in misconduct.

¶195 Lastly, the Court contends that the Ranchers did not have the right to exclude others from entering the alternative livestock industry. Opinion, ¶¶ 51-53. On this basis, the Court concludes that the Ranchers' licenses "did not meet the three required criteria for compensability under *Members*" and, thus, are not compensable property interests. Opinion, ¶ 54. The Court never explains, however, why an inability to exclude others from entering the industry is dispositive of the "property" question. The Ranchers do not claim a property right in the alternative livestock industry, so why would they need to exclude others from it? Rather, according to the Court, they claim a property right in their licenses, and each Rancher obviously had title in his or her license to the exclusion of all others. In any event, the Court is flat wrong in asserting that the right to exclude is dispositive of the "property" question. "Precedent shows that the ability to exercise every one of the 'sticks' (rights) in the 'bundle' of fee simple rights at the time of a taking is not a prerequisite to establishing a valid property interest under the Fifth Amendment." *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003).

¶196 In sum, I would hold that under the standards of *Penn Central*, I-143 took from the Ranchers a traditional hallmark of property—the right to transfer their alternative livestock ranch licenses and, correspondingly, their businesses—and that the Ranchers are entitled to just compensation for this taking. Moreover, I disagree with the Court's

contention that the licenses themselves are not property entitled to protection under the Takings Clause.

## 2. The Intangible Business Assets

¶197   The Ranchers claim that I-143 took the goodwill and going-concern value of their businesses. It is useful at the outset to define these terms.

¶198   "[A]n operating business can have a value in excess of the values of the separate assets that compose the business." Julius L. Sackman, *Nichols on Eminent Domain* vol. 4, § 13.18[2], 13-169 (3d ed., Matthew Bender 2007). Indeed, in the same way that a person is not just a collection of flesh, bones, and organs, a business is not just the sum of its parts. A going business has value because of its vitality, because of its ability to compete, and because of the synergy of its constituent parts which enable it efficiently to manufacture a good, market a product, or provide a service. It cannot be gainsaid that the value of a business assessed as a going concern is greater than the value of a business which has been dismantled and sold for its constituent assets (to the extent the assets even have value independent of the business). For instance, witness the difference in value of a farm or ranch sold as a working operation and one whose assets are sold at auction.

¶199   This difference is known as "going-concern value," which is " 'a term used to explain that assets that are a part of a going concern have greater value than the sum of the values of individual assets.' " *Warnick v. Warnick*, 133 P.3d 997, ¶ 15 n. 6 (Wyo. 2006) (quoting Donald J. Weidner & John W. Larson, *The Revised Uniform Partnership Act: The Reporters' Overview*, 49 Bus. Law. 1, 12 (1993)); *see also* Sackman, *Nichols on Eminent Domain* § 13.18[2], 13-168 (" 'The term may be used to refer either to the total

value of a going concern or that portion of the total value that exceeds the value of the other identifiable assets of the business.' " (quoting R. Miles, *Basic Business Appraisal* 19 (John Wiley & Sons 1984))). Going-concern value also represents "the many advantages inherent in acquiring an operating business as compared to starting a new business with only land, buildings and equipment in place," *Gray Line Bus Co. v. Greater Bridgeport Transit Dist.*, 449 A.2d 1036, 1039 (Conn. 1982), such as the avoidance of start-up costs and the ability to realize a higher rate of return than a newly established firm due to greater efficiency in operations, marketing, and administration, *see* Lynda J. Oswald, *Goodwill and Going-Concern Value: Emerging Factors in the Just Compensation Equation*, 32 B.C. L. Rev. 283, 289 (1991).

¶200 In contrast, "goodwill" is "the expectation of continued public patronage." Section 30-13-121, MCA; *Esselstyn v. Holmes*, 42 Mont. 507, 516, 114 P. 118, 120 (1911). This expectation may be founded on reputation, regular customers, favorable location, good service, high-quality merchandise, capable staff, good relations with suppliers, and similar intangible concepts. *See Baldwin v. Stuber*, 182 Mont. 501, 506-07, 597 P.2d 1135, 1138 (1979); *In re Marriage of Hull*, 219 Mont. 480, 484, 712 P.2d 1317, 1320 (1986); *BAA, PLC v. Acacia Mut. Life Ins. Co.*, 929 A.2d 1, 17 n. 24 (Md. 2007); *Dugan v. Dugan*, 457 A.2d 1, 4-5 (N.J. 1983); Sackman, *Nichols on Eminent Domain* § 13.18[2], 13-167; 38 Am. Jur. 2d *Good Will* § 5 (1999). Thus, goodwill has been defined as "the advantages a business has over competitors as a result of its name, location and owner's reputation." *Russell v. Jim Russell Supply*, 558 N.E.2d 115, 121 (Ill. App. 5th Dist. 1990).

¶201 It is beyond dispute that goodwill and going-concern value are compensable property interests; this fact is recognized under both federal and state law. *See Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1382 n. 3 (Fed. Cir. 2008) ("[G]oing concern value and goodwill are indeed compensable property interests."); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 13, 69 S. Ct. 1434, 1441 (1949) ("[A]n exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable 'taking' of property."); *Los Angeles Gas & Elec. Corp. v. Railroad Commission*, 289 U.S. 287, 313, 53 S. Ct. 637, 647 (1933) ("This Court has declared it to be self-evident that there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, and that this element of value is a property right which should be considered in determining the value of the property, upon which the owner has a right to make a fair return." (internal quotation marks omitted)); §§ 70-1-101, -104(4), MCA (defining "property" to include "such products of labor or skill as . . . the goodwill of a business"); *Esselstyn*, 42 Mont. at 516, 114 P. at 120 ("The goodwill of a business . . . is property capable of transfer, and the owner is entitled to the same protection in the exclusive enjoyment of it as he is in that of his tangible possessions." (citation omitted)).

¶202 The question, therefore, is whether I-143 effected a taking of the goodwill and going-concern value of the Ranchers' businesses. In my view, the answer to this question is an obvious "Yes." The District Court found—and I agree—that I-143 had "a significant economic impact on [the Ranchers'] game farm businesses." *See also* Opinion, ¶ 62 ("[I-143] had a significant impact upon the value of their businesses.").

62

Indeed, the Initiative effectively outlawed alternative livestock ranches. In this respect, like the total abrogation of the right to transfer their licenses, the character of the regulation vis-à-vis the Ranchers' goodwill and going-concern value is "extraordinary." *Hodel v. Irving*, 481 U.S. 704, 716, 107 S. Ct. 2076, 2083 (1987). I-143 was designed to shut down the Ranchers' businesses; it accomplished that purpose; and, in so doing, it fully devalued the goodwill and going-concern value of those businesses. As far as the Ranchers' goodwill and going-concern value are concerned, I-143 is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082 (2005).

¶203 The Court points out repeatedly that the alternative livestock industry was "highly regulated." Notably, the Court does not disclose the legal standard by which an industry may be judged "highly regulated" for purposes of takings analysis. More importantly, I question whether this fact is entitled to the significance given it by the Court. Indeed,

> the fact that the industry is regulated [is not] dispositive. A business that operates in a heavily-regulated industry should reasonably expect certain types of regulatory changes that may affect the value of its investments. But that does not mean that *all* regulatory changes are reasonably foreseeable or that regulated businesses can have *no* reasonable investment-backed expectations whatsoever.

*Cienega Gardens v. United States*, 331 F.3d 1319, 1350 (Fed. Cir. 2003); *see also Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 379 (2004) ("[I]ndividuals operating in highly regulated fields do not forfeit their rights under the Fifth Amendment to the whim of whatever regulation the winds may bring."). Here, the Ranchers'

investment-backed expectations certainly included the expectation that the regulatory scheme would be adjusted over time, as had been the case over the preceding 75 years. However, I-143 did not "adjust" the regulatory scheme; rather, it rendered the scheme's existence entirely pointless, since none of the businesses in the industry can survive after I-143. I cannot agree with the Court's fanciful suggestion that the Ranchers should have expected the passage of such a regulation, i.e., one that would render all of the other existing regulations moot. *Cf. Cienega Gardens*, 331 F.3d at 1350 (observing that "one would not reasonably expect Congress to make legislative changes that would actually discourage parties from participating in the programs in the future").

¶204 In this connection, I-143 must be distinguished from typical regulations. The Initiative did not *directly* address any of the concerns which led to its passage. I-143 prohibited fee shooting; yet, it cannot plausibly be maintained that the act of paying a fee to shoot alternative livestock is itself the source of chronic wasting disease, the threat to fair-chase hunting ethics, and the discontent over "European style" privatization of wildlife. Rather, the prohibition on fee shooting was a means to an end—namely, to shut down all alternative livestock ranches. Consequently, I-143 differs from regulations that "adjust" the regulatory scheme in order to directly address a matter of public concern, such as the new fencing requirements imposed on alternative livestock ranches over the years and the moratorium placed on new applications for initial alternative livestock ranch licenses until a test for chronic wasting disease is developed and approved. While such regulations may incidentally impact the value of businesses in the industry, they are not even remotely in the same league as I-143, which did not "regulate" alternative

64

livestock ranches in the usual sense, but instead deliberately wiped out the economic viability of these businesses. A voter initiative prompted by dissatisfaction with insurance companies and which permitted such companies to continue issuing policies but prohibited them from charging premiums would achieve much the same result, as would an initiative that permitted coal-fired generation plants to continue operating but prohibited them from charging for the electricity they provided, or an initiative that permitted oil companies to continue selling gasoline but prohibited them from charging anything at the pump, or an initiative that permitted banks to continue loaning money but prohibited them from charging interest, or an initiative that permitted grain farmers to continue harvesting their crops but prohibited them from charging for their wheat. Obviously, the list is endless.

¶205 This case, therefore, does not involve a new regulation that has made operation of a business less profitable or has caused a slight diminution in a business's value. It has been said that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S. Ct. 158, 159 (1922). I-143, however, did not impose additional regulatory burdens on the business of alternative livestock ranching. Rather, it deliberately and effectively legislated all such businesses out of existence. As a result, the values incident to the Ranchers' property were not merely "diminished"; they were largely obliterated. *Cf. Martin v. District of Columbia*, 205 U.S. 135, 139, 27 S. Ct. 440, 441 (1907) ("Constitutional rights like others are matters of degree. To illustrate: Under the police power, in its strict sense, a

certain limit might be set to the height of buildings without compensation; but to make that limit five feet would require compensation and a taking by eminent domain.").

¶206 On one hand, the Court acknowledges that the changes in the regulatory scheme brought about by I-143 were "radical." Opinion, ¶ 6. I agree. On the other hand, however, the Court suggests that the Ranchers should have reasonably anticipated such changes given the "highly regulated" nature of the alternative livestock industry. Opinion, ¶ 93. In so doing, the Court ignores several critical facts supporting the Ranchers' investment-backed expectations in that industry. For one, the Legislature told the Ranchers that alternative livestock ranching was "a viable economic opportunity." Section 87-4-431, MCA (1999). The Ranchers were also assured that they would be allowed to continue operating their alternative livestock businesses so long as they paid the license renewal fees, complied with all recording and reporting requirements, and did not engage in misconduct. Sections 87-4-412(1), -423(1), -427(1), MCA. Now, of course, they are being told that they may continue operating, but that they must do so without any income. The point here, however, is that the regulatory scheme itself engendered reasonable investment-backed expectations. Those, combined with the significant economic impact I-143 had on the Ranchers' businesses and the extraordinary character of the regulation, lead me to conclude that I-143 took the Ranchers' goodwill and going-concern value.

¶207 This conclusion is bolstered by precedents from other states, as well as a pre-*Penn Central* decision of the Supreme Court. Under the business losses rule, when the government condemns the real property upon which a business is operated, the owner

66

recovers only the value of the real property and the fixtures taken. There is no recovery for loss of goodwill and going-concern value, loss of profits, and relocation or removal expenses. *See* Lynda J. Oswald, *Goodwill and Going-Concern Value: Emerging Factors in the Just Compensation Equation*, 32 B.C. L. Rev. 283, 286-87 (1991); *see also e.g. United States v. Petty Motor Co.*, 327 U.S. 372, 378-79, 66 S. Ct. 596, 599-600 (1946). One of the justifications for this rule is that the business can still be carried on elsewhere, the goodwill or going-concern value can be transferred with it to the new location without loss of value, and nothing, therefore, has been taken. Oswald, 32 B.C. L. Rev. at 310. Notably, the business losses rule has been subject to withering criticism and has been rejected by a number of courts and legislatures. *See* Oswald, 32 B.C. L. Rev. at 319-75; *State v. Hammer*, 550 P.2d 820, 823-26 (Alaska 1976); *Bowers v. Fulton County*, 146 S.E.2d 884, 889-91 (Ga. 1966); *Michigan State Highway Commn. v. L & L Concession Co.*, 187 N.W.2d 465, 468-69 (Mich. App. 1971); *Luber v. Milwaukee County*, 177 N.W.2d 380, 383-86 (Wis. 1970); *City of Janesville v. CC Midwest, Inc.*, 734 N.W.2d 428, ¶ 80 (Wis. 2007) (Prosser, J., dissenting).

¶208   An exception to the business losses rule applies where the business was destroyed or made otherwise unusable as a result of the governmental action. In *Kimball Laundry Co. v. United States*, 338 U.S. 1, 69 S. Ct. 1434 (1949), for instance, the government took temporary possession of a laundry, and the Laundry, having no other means of serving its customers, suspended business for the duration of the government's occupancy. *Kimball Laundry*, 338 U.S. at 3, 69 S. Ct. at 1436-37. Thereafter, the Laundry claimed entitlement to compensation for the loss of goodwill and going-concern value during the

67

occupancy. *Kimball Laundry*, 338 U.S. at 8, 69 S. Ct. at 1439. The Supreme Court agreed. The Court first rejected the notion that the intangible nature of these assets precluded recovery, observing that since the Fifth Amendment requires compensation for the value of a business's physical property, it also requires compensation for the value of intangible assets. *Kimball Laundry*, 338 U.S. at 11, 69 S. Ct. at 1440. The Court then discussed the rule that where an owner is free to move his business to a new location, there is no compensation for going-concern value since this asset has not been "taken." *Kimball Laundry*, 338 U.S. at 11-12, 69 S. Ct. at 1440-41. Conversely, the Court observed, this rule does not apply where the owner retains nothing of the going-concern value that he formerly possessed. *Kimball Laundry*, 338 U.S. at 12-13, 69 S. Ct. at 1441. Indeed, the Court stated that "an exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable 'taking' of property." *Kimball Laundry*, 338 U.S. at 13, 69 S. Ct. at 1441. Thus, for example, when the government condemns business property with the intention of carrying on the business, "the going-concern value of the business is at the Government's disposal whether or not it chooses to avail itself of it. Since what the owner had has transferable value, the situation is apt for the oft-quoted remark of Mr. Justice Holmes, 'the question is, What has the owner lost? not, What has the taker gained?' " *Kimball Laundry*, 338 U.S. at 12, 13, 69 S. Ct. at 1441. The Court concluded that the situation at hand came within this principle. *See Kimball Laundry*, 338 U.S. at 14, 69 S. Ct. at 1442.

¶209 The Minnesota Supreme Court reached a similar conclusion in *State v. Saugen*, 169 N.W.2d 37 (Minn. 1969). In that case, the government condemned property upon which the condemnee had been operating a lounge. The condemnee had attempted to transfer the going-concern value of the business to another location but could not do so due to a restriction on the transfer of his liquor license. The issue on appeal, therefore, was "whether the going-concern value of a liquor lounge, operating under a valid city liquor license, is property taken, destroyed, or damaged by the state's condemnation of the premises for which compensation should be given." *Saugen*, 169 N.W.2d at 39. The court first held that neither the intangible character of going-concern value nor the fact that the lounge was operated under the authority of a license precluded compensation for a taking. *Saugen*, 169 N.W.2d at 39-42. The court then acknowledged "the general rule that loss of going-concern value is not recoverable on condemnation." *Saugen*, 169 N.W.2d at 42. However, the court held that this rule was inapplicable given that the condemnee had been unable to relocate the business and, therefore, the going-concern value had been effectively destroyed. *See Saugen*, 169 N.W.2d at 46; *see also City of Minneapolis v. Schutt*, 256 N.W.2d 260, 265 (Minn. 1977) (stating that compensation for the destruction of going-concern value is permitted where the business "either cannot be relocated as a practical matter, or . . . relocation would result in irreparable harm to the interest").

¶210 In *Detroit v. Michael's Prescriptions*, 373 N.W.2d 219 (Mich. App. 1985), the court summarized the rule in Michigan as follows:

> [R]ecovery of the going concern value of a business lost to condemnation
> will depend on the transferability of that business to another location. If the
> business can be transferred, nothing is taken and compensation is therefore
> not required. . . . Generally, however, recovery will be allowed where the
> business derives its success from a location not easily duplicated or where
> relocation is foreclosed for reasons relating to the entire condemnation
> project.

*Michael's Prescriptions*, 373 N.W.2d at 224-25; *see also L & L Concession*, 187 N.W.2d at 469.

¶211 Applying these principles here, the Ranchers' businesses cannot be relocated as a practical matter, since I-143 effectively "outlawed" alternative livestock ranches in this State. Opinion, ¶ 92. Consequently, the goodwill and going-concern value of the businesses cannot be transferred to a new location. To the contrary, the goodwill and going-concern value have been destroyed by the passage of I-143. As a result, the Ranchers have been completely deprived of these assets. A governmental action which has "the inevitable effect of depriving the owner of the going-concern value of his business is a compensable 'taking' of property." *Kimball Laundry*, 338 U.S. at 13, 69 S. Ct. at 1441.

¶212 Before concluding, I again pause to address the Court's approach. The Court acknowledges at the outset that intangibles such as goodwill and going-concern value are "property" under Montana law. Opinion, ¶ 55. The Court also acknowledges that goodwill and going-concern value are compensable property interests under *Kimball Laundry*. Opinion, ¶ 56. Yet, the Court adopts as "true" the District Court's highly questionable assertion that intangibles such as goodwill and going-concern value are compensable only in eminent domain proceedings, and not in the regulatory takings

context. Opinion, ¶ 55. I am aware of no authority—and the Court cites none—standing for the proposition that a property interest, for which the owner is entitled to compensation in a direct condemnation action, is not also compensable in a regulatory takings action. I must also confess that the rationale for such a distinction escapes me, particularly given the lack of any textual support for it in the Takings Clause, which simply states: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

¶213 Next, the Court attempts to avoid the rule of *Kimball Laundry* by limiting that case to "those rare circumstances where the government actually intends to take over the claimant's business and thereby appropriate the goodwill and going-concern value for its own use." Opinion, ¶ 56. Nothing in *Kimball Laundry* supports this narrow reading of the opinion. To the contrary, the Supreme Court stated:

> [A]n exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable "taking" of property. If such a deprivation has occurred, the going-concern value of the business is at the Government's disposal *whether or not it chooses to avail itself of it.*

*Kimball Laundry*, 338 U.S. at 13, 69 S. Ct. at 1441 (emphasis added, citations omitted).

¶214 The critical fact in *Kimball Laundry* was not the government's "intent" (Opinion, ¶ 56) or "actual physical occupation" of the laundry (Opinion, ¶ 57). Rather, it was the inability of the Laundry to transfer its going-concern value to another location. *Kimball Laundry*, 338 U.S. at 14-16, 69 S. Ct. at 1442-43. Moreover, the Court should take note that " 'the Constitution measures a taking of property not by what a State says, or by what it intends, but by what it *does*.' " *San Diego Gas & Elec. Co. v. San Diego*, 450 U.S.

71

621, 652-53, 101 S. Ct. 1287, 1304 (1981) (Brennan, Stewart, Marshall, & Powell, JJ., dissenting) (quoting *Hughes v. Washington*, 389 U.S. 290, 298, 88 S. Ct. 438, 443 (1967) (Stewart, J., concurring) (emphasis in *Hughes*), and citing *Davis v. Newton Coal Co.*, 267 U.S. 292, 301, 45 S. Ct. 305, 306 (1925)). Notably, in attempting to limit *Kimball Laundry*, the Court places the focus of the analysis on what the State gained. This approach is contrary to the rule that our focus must be on what the property owner lost. *Kimball Laundry*, 338 U.S. at 13, 69 S. Ct. at 1441 (" '[T]he question is, What has the owner lost? not, What has the taker gained?' "); *see also United States v. Causby*, 328 U.S. 256, 261, 66 S. Ct. 1062, 1065-66 (1946). From the Ranchers' perspective, there is no difference between the State's taking over their businesses, thereby appropriating the goodwill and going-concern value for its own use, and the State's shutting down the businesses through a regulatory enactment so that no one can operate them at all. The Court's attempt to distinguish the two is pure sophistry.

¶215 Lastly, the Court posits that "taking of goodwill or going-concern value differs markedly from other types of taking." Opinion, ¶ 57. The Court speculates that "[t]his is likely because what the claimant alleges has been 'taken' is an expectation of future profitability." Opinion, ¶ 57. Proceeding on this assumption, the Court cites and discusses a number of cases for the proposition that an expectation of future profitability is not a compensable property interest. Opinion, ¶¶ 57-62. At the conclusion of these citations, the Court baldly rewrites the Ranchers' claim that I-143 took their "intangible business assets" as a claim that I-143 took their "ability to profit from fee-shooting." Opinion, ¶ 63. Having thus transformed the Ranchers' claim, the Court reaches the

72

conclusion that the Ranchers' "ability to profit from fee-shooting" is not compensable "because there has been no physical condemnation or occupation of [the Ranchers'] property by the State." Opinion, ¶ 63.

¶216 This conclusion is truly perplexing. For one thing, the Court expends several pages arguing that an expectation of future profitability is not a compensable property interest, only to reach the conclusion that an ability to profit *is* compensable if the State physically condemns or occupies the business. Moreover, I am not persuaded that an "ability to profit from fee-shooting" is compensable if the State "physically condemns or occupies" the Ranchers' property but is not compensable if the State simply passes a regulation putting the Ranchers out of business. That the Court treats these two scenarios as constitutionally distinct, without a shred of authority for support, is troubling.

¶217 Ultimately, however, the distinction is irrelevant because the Ranchers do not claim a taking of their "ability to profit from fee-shooting." What they claim, rather, is that I-143 took the goodwill and going-concern value of their businesses. These are existing, quantifiable, and compensable property interests, recognized as such in the cases cited above. Where the government deprives an owner of the goodwill and going-concern value of his business, it is a compensable taking of property. *Kimball Laundry*, 338 U.S. at 13, 69 S. Ct. at 1441. In my view, that proposition is sufficient to resolve the Ranchers' claims with respect to their intangible business assets.

¶218 In sum, I would hold that I-143 took the goodwill and going-concern value of the Ranchers' businesses and that the Ranchers are entitled to just compensation for this taking. Moreover, I disagree with the Court's entire discussion at ¶¶ 55-64. In order to

reject the Ranchers' legitimate takings claims, the Court manufactures a novel new rule: Although a business owner may be deprived of the goodwill and going-concern value of his business by either regulation or direct appropriation, he is entitled to compensation only in the latter circumstance. There is no logical reason, no persuasive justification, and no legal authority offered in support of this incongruous rule. What the Court fails to recognize is that the ultimate question in a Fifth Amendment regulatory takings analysis is whether the regulation is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537, 125 S. Ct. 2074, 2081 (2005). Certainly, if a regulation is so onerous that its effect is tantamount to a direct appropriation of goodwill or going-concern value—and I-143 is such a regulation—then just compensation is required.

### 3. The Real Estate Interests and Fixtures

¶219 Given the prolonged discussions under the two preceding categories, only a brief discussion is necessary here. First, I tend to agree with the Court's conclusion that I-143 did not take the Ranchers' real estate. Opinion, ¶ 80. However, there is a glaring omission from the Court's discussion: an analysis of the fixtures. The Court's heading reads, "Appellants' Real Estate Interests and Fixtures," and the Court mentions fixtures several times in ¶¶ 80-83. Yet, nowhere is there a discrete analysis of the fixtures. Rather, the Court seems to lump them together with the land. This, in my view, is error. The Ranchers installed a number of fixtures on their property specifically designed for the purpose of operating alternative livestock ranches, including fences and certain outbuildings. To the extent I-143 has rendered these fixtures valueless, I conclude that

the Ranchers are entitled to just compensation for essentially the same reasons I concluded above that they are entitled to just compensation for the loss of their right to transfer their alternative livestock ranch licenses and businesses and for the loss of their intangible business assets.

### 4. The Alternative Livestock

¶220   The last category is the Ranchers' alternative livestock.  Everyone agrees that the alternative livestock is a compensable property interest.  *See* Opinion, ¶ 66.  Thus, the question is whether this property was "taken" under the *Penn Central* standards.

¶221   The Court observes that the Ranchers' alternative livestock suffered "significant devaluation" as a result of I-143 and that the diminished value was insufficient even to cover the cost of raising and maintaining the livestock.  Opinion, ¶¶ 84, 85.  As a matter of fact, the Ranchers can sell their alternative livestock only at a loss.  Opinion, ¶ 85.  The Court concludes, therefore, that the economic-impact factor "weighs in favor of finding a compensable taking" of the alternative livestock.  Opinion, ¶ 85.  I generally agree with these observations; however, given that I-143 devalued the alternative livestock by 70 to 95 percent, Opinion, ¶ 84, and given that the primary focus of our analysis is on "the severity of the burden that [I-143] imposes upon private property rights," *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082, I conclude that the economic-impact factor weighs *very heavily* in favor of the Ranchers' claims.

¶222   The Court next addresses the character of the governmental action.  Opinion, ¶¶ 86-88.  The Court acknowledges that I-143 placed the economic burden of eliminating alternative livestock ranches "squarely on the shoulders" of the individuals in the industry

and that "individuals like [the Ranchers], and not the public as a whole, are being asked to bear the burden." Opinion, ¶ 86. This, the Court recognizes, "seems to run afoul" of the rule that the State may not " 'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " Opinion, ¶ 86 (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 1569 (1960)). On all of these points, I agree.

¶223 I do not agree, however, with the Court's subsequent attempt to downplay I-143's intrusion on the Ranchers' property rights as "slight" and "minimal." Opinion, ¶¶ 87, 88. The Court points out that the State has not seized the Ranchers' alternative livestock. True, but the alternative livestock no longer have any economically viable use, as the Court itself acknowledges in ¶ 85 (noting that the value of the livestock is "insufficient to even cover the cost of raising and maintaining [them]" and that the Ranchers "could only sell the alternative livestock at a loss"). That is tantamount to seizing the alternative livestock. *Cf. Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1017, 112 S. Ct. 2886, 2894 (1992) ("[T]otal deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation."). The Court also contends that I-143 merely prohibited one use of the Ranchers' alternative livestock and left them open to exploit other uses of the livestock. For instance, the Court proposes that the Ranchers could sell the alternative livestock (admittedly, at a loss) to out-of-state markets or "allow others to shoot [the alternative livestock] in Montana, so long as no fee is charged." Opinion, ¶ 87. However, these entirely unprofitable (not to mention implausible) uses of

the alternative livestock only persuade me further that I-143's impact is far from "slight" and "minimal."

¶224 The Court's attempt to analogize this case to *Andrus v. Allard*, 444 U.S. 51, 100 S. Ct. 318 (1979), is similarly unpersuasive. *Andrus* involved federal regulations promulgated pursuant to the Eagle Protection Act and the Migratory Bird Treaty Act. The regulations prohibited commercial transactions in parts of birds that had been legally killed before the birds came under the protection of the Acts. The appellees were engaged in the trade of Indian artifacts composed partly of the feathers of protected birds, and these artifacts existed before the regulations went into effect. One of the issues on appeal, therefore, was whether "the Eagle Protection and Migratory Bird Treaty Acts violate appellees' Fifth Amendment property rights because the prohibition [on commercial transactions in preexisting avian artifacts] wholly deprives them of the opportunity to earn a profit from those relics." *See Andrus*, 444 U.S. at 52-55, 64, 100 S. Ct. at 320-21, 326.

¶225 In answering this question, the Supreme Court observed that the challenged regulations neither compelled the surrender of, nor imposed a physical restraint on, the artifacts; rather, they imposed a restriction on one means of disposing of the artifacts. *Andrus*, 444 U.S. at 65, 100 S. Ct. at 327. The Court acknowledged that the regulations prevented "the most profitable use" of the appellees' property; at the same time, however, it was "not clear that appellees will be unable to derive economic benefit from the artifacts." *Andrus*, 444 U.S. at 66, 100 S. Ct. at 327. The Court ultimately concluded that in the absence of any physical property restriction, the reduction in profits—*i.e.*, the

difference between the most profitable use of the property pre-regulation and the most profitable use of the property post-regulation—was too speculative and, thus, "a slender reed upon which to rest a takings claim." *Andrus*, 444 U.S. at 66, 100 S. Ct. at 327. Hence, the Court held that the prohibition on the sale of the bird feathers did not amount to a taking. *Andrus*, 444 U.S. at 67-68, 100 S. Ct. at 328.

¶226   As an initial matter, the extent to which the holding of *Andrus* may be extended beyond the specific facts of that case is questionable. *See Hodel v. Irving*, 481 U.S. 704, 719, 107 S. Ct. 2076, 2085 (1987) (Scalia, J., Rehnquist, C.J., & Powell, J., concurring) (concluding that "in finding a taking today our decision effectively limits *Allard* to its facts"); *but see Irving*, 481 U.S. at 718, 107 S. Ct. at 2084 (Brennan, Marshall, & Blackmun, JJ., concurring) ("I find nothing in today's opinion that would limit *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318 (1979), to its facts."). But, setting that question aside, the character of the governmental action in *Andrus* is, in any event, totally distinguishable from the character of the governmental action here.

¶227   The regulations at issue in *Andrus* were designed to prevent the destruction of certain species of birds, which in turn caused an incidental reduction in profits for those engaged in the trade of Indian artifacts. But the appellees still had the opportunity to use their property in other economically viable ways. *Andrus*, 444 U.S. at 66, 100 S. Ct. at 327. I-143, by contrast, was not designed to regulate the use, care, or disposal of alternative livestock. Rather, it was designed to regulate the price of penned hunts so as to eliminate the alternative livestock's value completely. It is important, in this regard, to recall that the Sportsmen's concerns in drafting I-143 were with chronic wasting disease

("CWD"), unethical hunting, and private ownership of game animals. Obviously, all of these concerns could be resolved in one fell swoop by simply seizing the alternative livestock and prohibiting private ownership of game animals, but such action clearly would require the payment of compensation. Alternatively, the Sportsmen's goals could be achieved if the Ranchers were left with no choice but to get rid of their alternative livestock, but that would not likely occur if the Ranchers were able to derive economic benefit from them. Thus, the Sportsmen "carefully crafted" I-143 to eliminate all economically beneficial use of the alternative livestock.

¶228 Ironically, in so doing, and in spite of their concern with diseases, the Sportsmen gave the Ranchers an incentive to neglect their alternative livestock and allow them to become diseased. That way, the government would destroy the animals and pay the Ranchers for the loss. *Compare* 9 C.F.R. § 55.2 ("The Administrator is authorized to pay for the purchase and destruction of CWD positive animals, CWD exposed animals, and CWD suspect animals. Subject to available funding, the amount of the Federal payment for any such animals will be 95 percent of the appraised value established in accordance with § 55.3 of this part, but the Federal payment shall not exceed $3,000 per animal."), *with* Opinion, ¶ 84 (observing that the Ranchers were getting between $500 and $1,800 per animal selling them on the market). I-143 and this Court's decision, therefore, create the perverse result that good stewards of animals whose healthy herds are devalued by way of a "carefully crafted" political ploy receive nothing, while those whose herds have become diseased due to careless management receive compensation. One has to wonder where there is "fairness and justice" in such a scheme.

79

¶229 In any event, given that I-143 specifically targets the Ranchers to bear the entire burden of eliminating alternative livestock ranches, and given that I-143, for all intents and purposes, caused "the complete elimination of [the alternative livestock's] value," *Lingle*, 544 U.S. at 539, 125 S. Ct. at 2082 (citing *Lucas*, 505 U.S. at 1017, 112 S. Ct. at 2894); *cf. Yancey v. United States*, 915 F.2d 1534, 1541-42 (Fed. Cir. 1990) (finding a compensable taking where "the Yanceys had no choice but to sell their birds for substantially less than their value"), I conclude that the character of the governmental action weighs heavily in favor of the conclusion that I-143 effected a taking of the Ranchers' alternative livestock.

¶230 Lastly, the Court addresses the Ranchers' investment-backed expectations. Opinion, ¶¶ 89-93. The Court acknowledges that the whole reason the Ranchers expended "significant financial resources" on their respective operations was to offer penned hunts. Opinion, ¶ 89. Yet, the Court then asserts that it was unreasonable for the Ranchers "to maintain an investment-backed expectation that they would always be able to charge a fee to shoot alternative livestock in Montana." Opinion, ¶ 89. The Court points out that "the State never assured [the Ranchers] they would always be permitted to charge a fee to shoot alternative livestock in Montana." Opinion, ¶ 92.

¶231 With all due respect, the foregoing proposition is preposterous. The right to receive remuneration, in one form or another, for one's lawful goods and services has always been a part of this country's economic system. It is one thing to regulate the prices at which goods and services may be sold, but it is quite another to impose a price ceiling of $0.00. No business would, or should, *ever* expect that the State may require it

to offer its goods and services for free. *Cf. Stone v. Farmers' Loan & Trust Co. (Railroad Commission Cases)*, 116 U.S. 307, 331, 6 S. Ct. 334, 345 (1886) ("This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law.").

¶232 The Court offers a second theory that is only slightly more plausible than the first. Specifically, the Court asserts that due to "significant public unrest," the Ranchers "knew, or should have known," that alternative livestock ranches were "highly controversial" and that initiative measures could be passed which would outlaw such operations entirely. Opinion, ¶ 92. The Court thus reasons that the Ranchers "could not maintain a reasonable investment-backed expectation" that the industry would not someday be "completely abolished." Opinion, ¶ 93.

¶233 There are several flaws—factual as well as legal—with this theory. First, the history of alternative livestock ranching does not support the expectations the Court attributes to the Ranchers. The "public unrest" that led to I-143 was not new. As a matter of fact, the 1982 Game Farm Task Force was created specifically to address then-existing public concerns and controversy surrounding alternative livestock ranching. *See* Part II-A, *supra*. But that controversy did not lead to the out-and-out elimination of the industry. To the contrary, it resulted in a compromise involving, on one hand, the imposition of new requirements on alternative livestock ranch operations and, on the

81

other hand, the codification of certain "rights" designed to protect the interests of participants in the alternative livestock industry. Thus, if the Ranchers should have expected a change due to the "public unrest" existing in the 1990s, additional safety and testing requirements are far more plausible than a regulation designed to put them out of business by prohibiting remuneration for penned hunts. Indeed, the Court acknowledges that the changes in the regulatory scheme brought about by I-143 were "radical." Opinion, ¶ 6.

¶234 Second, and along these same lines, it is important to recall that nothing in the "public unrest" prior to I-143 had anything to do with the size of the fees the Ranchers were charging for penned hunts or the fact that fees were being charged. Therefore, even if the Ranchers should have anticipated some adjustments to the regulatory scheme, a prohibition on charging a fee to shoot alternative livestock cannot fairly be categorized as one such adjustment—especially since penned hunts are still perfectly legal, as long as they are conducted for free.

¶235 Third, notwithstanding the "public unrest" to which the Court refers, the 1999 Legislature passed a statute which read: "The legislature recognizes that the production of alternative livestock provides a viable economic opportunity for any private property owner as well as the traditional livestock producers who are interested in diversifying their ranch productivity." Section 87-4-431, MCA. It is quite far-fetched to assert, as the Court does, that the Ranchers should have anticipated the State was on the verge of abolishing alternative livestock ranching when the Legislature, meanwhile, was passing a statute characterizing the activity as "a viable economic opportunity." Given that

alternative livestock ranching had been a lawful "business or occupation" in this State for over 75 years, and given that an alternative livestock ranch license was renewable as a matter of right and could not be revoked unless the licensee engaged in misconduct, §§ 87-4-412(1), -423(1), -427(1), MCA, it was far more reasonable for the Ranchers to maintain investment-backed expectations that their ability to continue operating their alternative livestock ranches was secure.

¶236 Lastly, at a more fundamental level, I question the Court's reliance on what the Ranchers "knew, or should have known." The Court opines that a regulation does not take property if it was "reasonably anticipated." Opinion, ¶ 93. But if the notion of a "regulatory taking" is to have any vitality, then the Court's theory must be roundly rejected. It is unlikely in today's world, where regulations of property are prevalent, that any property owner could *ever* argue that a particular regulation was unexpected or not reasonably anticipated. "[E]xcept for a regulation of almost unimaginable abruptness, all regulation will build on prior regulation and hence be said to defeat any expectations. Thus regulation begets regulation." *District Intown Properties v. District of Columbia*, 198 F.3d 874, 887 (D.C. Cir. 1999) (Williams, J., concurring in the judgment). If the meaning of "taking" may be qualified by the degree to which a regulation is "reasonably anticipated," then "the natural tendency of human nature is to extend the qualification more and more until at last private property disappears." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922).

¶237 That is exactly the untenable result under the Court's approach: A business that operates in an industry with a history of regulation must expect that the regulations may

be strengthened to achieve public needs, and this expectation, in turn, negates any entitlement the business might otherwise have to compensation for a taking. Indeed, this expectation, according to the Court, outweighs even a "significant devaluation" of property disproportionately placed on the business. Such an approach drains the doctrine of "regulatory takings" of all force and purpose. There is no basis in logic or in the Takings Clause for distinguishing between two equally burdened property owners on the ground that one of them had advance notice of the regulation while the other was caught completely off guard. Either private property rights were taken, or they were not. If the former, just compensation must be paid, irrespective of the amount of notice the property owner had of the regulation's enactment.

¶238 In my view, the Ranchers' had reasonable investment-backed expectations related to their alternative livestock, given the long history of alternative livestock ranching, the statutory provisions designed to protect the interests of participants in the industry, and the Legislature's pronouncement that this activity was "a viable economic opportunity." I conclude that this factor weighs in favor of the Ranchers' claims.

¶239 Having analyzed the three *Penn Central* factors, I would hold that the Ranchers are entitled to just compensation for the "substantial devaluation" of their alternative livestock. While we may disagree as to the reasonableness of the Ranchers' investment-backed expectations in light of the "significant public unrest," I believe that the three factors, taken together, mandate the conclusion that I-143 effected a taking of the Ranchers' alternative livestock. Both the economic impact of I-143 on the value of the

alternative livestock and the character of the regulation weigh heavily in favor of this conclusion.

### 5. Conclusion of Fifth Amendment Analysis

¶240  In conclusion, based on the foregoing *Penn Central* analysis, I would hold that I-143 effected a taking of the Ranchers' right to transfer their alternative livestock ranch licenses and businesses, of the goodwill and going-concern value of their businesses, of the fixtures related to their alternative livestock operations, and of their alternative livestock.  I would further hold that the Ranchers are entitled to just compensation for these takings.  I would reverse the District Court's judgment and remand for further proceedings related to the issue of just compensation.

### IV.  CONCLUSION

¶241
*You take my house, when you do take the prop
That doth sustain my house; you take my life,
When you do take the means whereby I live.*[6]

¶242  Arguably, I-143 was a fraud on the voters.  It purported to address a number of "problems" associated with alternative livestock ranching, but it did not actually address any of those problems—at least, not directly.  Instead, it eliminated the means whereby the Ranchers businesses existed, thereby destroying those businesses.  The voters were not told that the Initiative was a "carefully crafted" end-around the Constitution that could lead to a decision from this Court holding that the State may destroy the goodwill and going-concern value of a Montana business, substantially (if not completely) devalue

---

[6] William Shakespeare, The Merchant of Venice, Act IV, Scene 1, lines 375-77.

the business's assets, and deprive the business owner of her right to sell, assign, or otherwise transfer the business—all without having to pay just compensation.

¶243 The Court invokes notions of "fairness and justice" to deny the Ranchers any compensation for the out-and-out obliteration of their businesses. I-143 was designed to shut down an industry that the State had facilitated, and even encouraged, for 83 years and to place the entire economic burden of doing so on the participants in that industry. It is difficult to see any fairness or justice in this bait and switch, particularly since the Initiative was promoted as addressing legitimate public concerns shared not only by the Sportsmen, but by the public as a whole. A majority of voters—specifically, 204,282 of them—believed that the concerns cited by I-143's Proponents warranted "game farm reform." Given the severity of the burden this "reform" entailed, and given that the "reform" was intended to benefit all of Montana, fairness and justice require that the burden be spread among taxpayers through the payment of compensation, not disproportionately placed on the shoulders of the alternative livestock ranchers.

¶244 The economic impact on the Ranchers' various assets as a result of I-143 is unquestionably substantial. The character of the governmental action—total abrogation of property rights in and related to the Ranchers' businesses—is extraordinary. And the Ranchers' distinct investment-backed expectations in their ability to continue operating their businesses were quite reasonable in light of the history of alternative livestock ranching and the various assurances set out in the statutory scheme. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a

86

taking." *Mahon*, 260 U.S. at 415, 43 S. Ct. at 160. In light of the foregoing, I-143 went too far, and just compensation is due.

¶245 Aside from the immediate impact of the Court's decision on the Ranchers, the Opinion will, obviously, serve as precedent in future Montana takings cases. This Dissent is long—and will, no doubt, be criticized by some for that. However, I believe that the important issues implicated by the Ranchers' takings claims justified setting out, in detail, the reasons why federal takings jurisprudence is confused, often inconsistent, certainly not bulletproof, and not necessarily worthy of this Court's "marching lockstep" with it. I hope this Dissent will give some future takings litigant the impetus and ammunition to challenge federal caselaw in arguing that her facially broader fundamental rights under Article II, Section 29 should be upheld.

¶246 Additionally, I am very concerned that the Court's decision here will be used—and, more likely, misused—in government's ever-expanding reach to regulate—and, ultimately, take—Montanans' broadly-defined property rights, without having to assume and spread amongst all taxpayers the economic burdens of that regulation and taking. Similarly, I am concerned that today's decision will encourage more "carefully crafted" initiatives and legislation which end-run constitutional guarantees and mislead voters with smoke and mirrors. Finally, I am concerned that, recognizing "If they can do it to them, they can do it to me," citizens will propose and enact initiatives of the recent I-154 ilk—poorly drafted, overbroad, and underinclusive. Indeed, we invite the Legislature to enact laws to protect constitutional rights when this Court refuses to define and enforce those rights.

¶247 It is for all of these reasons I would hold that the Ranchers have established compensable property interests and have demonstrated that those property interests were "taken" under the Fifth Amendment. I would reverse the District Court's judgment and remand this case for further proceedings on the issue of just compensation.

¶248 Therefore, I respectfully dissent from the Court's contrary decision.

/S/ JAMES C. NELSON

Justice Jim Rice and District Court Judge Wm. Nels Swandal, sitting for Justice Brian Morris, join the Dissent of Justice James C. Nelson.

/S/ JIM RICE
/S/WM. NELS SWANDAL